**UNITED STATES of America, Appellee,**

v.

**Effie Sylvia LITTLE BEAR, Appellant.**

No. 78–1232.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 11, 1978.

Decided Sept. 19, 1978.

Orell D. Schmitz of Schlosser & Schmitz, Bismarck, N. D., filed brief for appellant.

James R. Britton, U. S. Atty., and James S. Hill, Asst. U. S. Atty., Bismarck, N. D., filed brief for appellee.

Before LAY, BRIGHT, and ROSS, Circuit Judges.

BRIGHT, Circuit Judge.

Effie Sylvia Little Bear takes this direct appeal from her jury conviction for manslaughter for the stabbing of Charles Warren Byington, committed within the Standing Rock Sioux Indian Reservation in the District of North Dakota, in violation of 18 U.S.C. §§ 1112, 1153 (1976).[1] The district court sentenced Ms. Little Bear to imprisonment for a term of two years. On this appeal Ms. Little Bear contends that (1) the district court erred in refusing to suppress statements she made to FBI agents, and (2) the jury selection procedure discriminated against rural residents, thereby violating her right to trial by an impartial jury. We affirm.

I.

Charles Warren Byington died from a massive stab wound inflicted at his home. Ms. Little Bear, the victim's common law wife, and Laura Mae Byington Ryckman, his daughter, were known to be residing with Byington at the time of his death.

On May 14, 1977, the day following the death, James Molash, a criminal investigator for the BIA, interviewed Ms. Little Bear at the police department. Agent Molash advised Ms. Little Bear of her constitutional rights, and she told him she wanted to sign the rights form and the waiver provision. Ms. Little Bear described to Molash her few recollections of the night Byington died, but stated she had no memory of what had happened to him.

Special agent Ivan W. Nicholson of the FBI joined the investigation into the death of Byington, and by July 1977 he and Molash had decided to give Ms. Little Bear a polygraph examination. Molash contacted Ms. Little Bear and reported to Nicholson that she was willing to take a polygraph examination.

When Ms. Little Bear arrived at the police department on July 29, 1977, she was met by agent Nicholson who explained to her that she had been asked to come for a polygraph examination. Nicholson then presented Ms. Little Bear with a "Consent to be Interviewed with Polygraph" form, which recited:

I, Effie Little Bear, consent freely and voluntarily to be interviewed by Special Agents of the Federal Bureau of Investigation, which I also known as FBI, in connection with [the] death of Charles Byington. I agree to the use of a polygraph or so-called 'lie detector' during this interview or any part of it, and I am willing to be present at the time and place of [the] interview for such time as necessary to complete the interview. No threats or promises of any kind have been made to me to obtain my consent to this interview.

Nicholson asserts no coercion was applied, and Ms. Little Bear admits signing the form.

Nicholson then proceeded to advise Ms. Little Bear of her constitutional rights. He read the FBI form listing the rights to her, and she signed the form's waiver provision.

Nicholson introduced Ms. Little Bear to FBI agent Charles Yeschke who explained the nature and function of a lie detector test as he attached the apparatus to Ms. Little Bear. Agent Yeschke mentioned nothing to Ms. Little Bear regarding the polygraph consent form or the rights-waiver form she had signed. As a preliminary

1. The Honorable Bruce M. Van Sickle, United States District Judge for the District of North Dakota, presiding.

question, Yeschke asked Ms. Little Bear if she had stabbed Byington. She responded in the affirmative and said she wanted to talk about it. At that point Yeschke removed the polygraph apparatus from her. He explained at trial that

> * * * I could see that the polygraph testing was not going to be appropriate at that time and that I would not be conducting a polygraph examination * * *.

Once the polygraph attachments were removed, Ms. Little Bear was not given any further admonitions or information concerning her rights to an attorney or to remain silent. Mr. Yeschke later testified that "[Ms. Little Bear] explained to me that she had stabbed Irish [Byington] * * *."

Yeschke drafted a statement consisting of Ms. Little Bear's confession. Agent Nicholson, who had left Ms. Little Bear alone with Yeschke, returned and witnessed Yeschke's reading and Ms. Little Bear's signing of the statement.

At the suppression hearing, Ms. Little Bear contended that the confession should not be admitted because she had not understood the rights to which she was entitled. She further contended that she did not recall being told she could have an attorney present or that one would be provided for her. She stated that she was nervous and scared. In denying her motion to suppress the statement, the district court indicated concern over the police techniques used in the case.

> [B]y giving the Consent to Interview with the Polygraph, before receiving the Advice of Rights, there was a possibility that the *suspect had been maneuvered into a position where she believed she did not have a capacity to refuse the interview* * * *. [Emphasis added.]

However, the district court determined from Ms. Little Bear's testimony that the order in which the documents were signed made no difference in this case. The court ruled that Ms. Little Bear had voluntarily confessed and it denied the suppression motion.

**II.**

On this appeal Ms. Little Bear challenges the district court's refusal to suppress at trial the oral and written statements she made to the FBI. The prosecution must demonstrate by a preponderance of the evidence that Ms. Little Bear's confession was voluntary. *See Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Upon a review of the record, we reject Ms. Little Bear's challenge and hold that she voluntarily supplied the FBI agents with her confession.

We share some concern of the district court over the procedure utilized by the FBI agents in obtaining the confession. The record in this case does not disclose the precise circumstances which induced Ms. Little Bear to consent to the polygraph test. Nonetheless, having consented, Ms. Little Bear appeared at the examination site where agent Yeschke attached to her the polygraph connections. In light of the unsettling circumstances and the psychological pressure inherent in a polygraph situation, it should not be surprising that an unsophisticated Indian woman, such as Ms. Little Bear, would be upset and nervous when confronted by the lie detector apparatus. In addition, the record does not indicate the FBI agents advised Ms. Little Bear that she could refuse to take the polygraph test, discontinue it at any point, or decline to answer any question.

Nevertheless, the record indicates that Ms. Little Bear not only signed the waiver of rights and consent to polygraph interview forms, but also understood what they meant.

In a case before the Court of Appeals for the Ninth Circuit, in circumstances somewhat similar to the instant case, the court held that a confession was properly admissible. In *Keiper v. Cupp,* 509 F.2d 238 (9th Cir. 1975), appellant Keiper had been given *Miranda* warnings on several occasions prior to and immediately before undertaking a polygraph examination. He signed a waiver of his rights at the polygraph interview. Upon being informed the examination revealed "gross deceptive patterns," Keiper

became "very emotional," broke down, and indicated he wanted to give a true statement. The state trial court determined that his statement was voluntary and that there had been no *Miranda* violation regarding any of the statements or in connection with the taking of the polygraph test. When the Court of Appeals for the Ninth Circuit took the case on appeal from the district court's denial of Keiper's habeas corpus petition, appellant Keiper contended that his statements had not been voluntary. Keiper urged that although he had been read his rights before the polygraph test began and signed a form waiving his rights, the waiver applied only to the polygraph examination and terminated when the test ended. He claimed he should have been given another *Miranda* warning following the polygraph examination and before his nonpolygraph statements were taken. The court determined that because Keiper, on numerous occasions, "had been advised *  * of his rights prior to, and at the time of the polygraph test, there is no reason to believe that he was not fully aware of those rights during the crucial period when his final story was taped." *Id.* at 241. This case somewhat parallels *Keiper* in that Ms. Little Bear also signed a waiver of rights form before a polygraph examination, indicated at some subsequent point that she wanted to offer a statement, and later claimed her statement was made involuntarily. Additionally, in the instant case, as in *Keiper,* the district court found Ms. Little Bear had voluntarily confessed and knowingly and intelligently waived her rights even though no second, post-polygraph *Miranda* warning was given.

The full record and careful questioning by the district court in this case shows, by a preponderance of the evidence, that Ms. Little Bear supplied her confession voluntarily. The district court committed no error in denying the motion to suppress.

■ Although we are satisfied with the district court's decision in the circumstances of this case, we must add a caveat concerning police questioning in a polygraph situation. Owing to the often coercive impact of a lie detector test, full instructions of the suspect's rights should be furnished whenever such examinations are administered to persons under criminal investigation. A state case with issues somewhat similar to those presented in the instant case suggests a proper procedure. In *State v. Henry,* 352 So.2d 643 (La.S.Ct.1977), the examiner informed the defendant at the outset of a polygraph interview that he need not answer and that he could discontinue the test at any time. After the examination defendant confessed. In its discussion of the voluntariness of the defendant's confession, the court suggested that advice to the suspect that he could discontinue the interview at any time supplied an important component in support of the finding of voluntariness. As part of the effort to remove or mitigate the pressures toward self-incrimination generated by a polygraph situation, we deem it essential that a person subject to a polygraph examination be apprised, at a minimum, of the rights to refuse to take the test, to discontinue it at any point, and to decline to answer any individual questions.

III.

■ Ms. Little Bear's trial was held on February 6, 7, and 8, 1978, in the United States Courthouse at Bismarck, North Dakota. Owing to inclement weather, the jurors responding to the court's call to duty disproportionately represented the more "urban" residents of the immediate area; outlying "rural" jurors were underrepresented.

Defendant does not complain that the jury selection plan in North Dakota, previously approved by this court, *see United States v. Freeman,* 514 F.2d 171 (8th Cir. 1975), embodies any inherent discrimination between rural and urban groups. However, defendant contends that, because of the rural-urban disparity in the particular array of jurors available for her trial, the court should have granted her motion for the calling of a new panel.

It is evident that there was no deficiency in the jury selection procedure as such. Defendant argues simply that the procedure must be "run through" again when an act

of God results in a particular array which is in some respects unrepresentative. The Supreme Court has observed that "[c]ircumstances or chance may well dictate that no persons in a certain class will serve on a particular jury or during some particular period." *Hernandez v. Texas,* 347 U.S. 475, 482, 74 S.Ct. 667, 672, 98 L.Ed. 866 (1954). We find no valid constitutional objection to the jury which tried Ms. Little Bear.

Affirmed.