STATE of South Dakota, Plaintiff
and Appellant,

v.

Daniel J. DuBOIS, Defendant
and Appellee.

No. 12681.

Supreme Court of South Dakota.

Argued Oct. 12, 1979.

Decided Dec. 24, 1979.

Rodney C. Lefholz, Pennington County Deputy State's Atty., Rapid City, for plaintiff and appellant; Lori Wilbur, Asst. Atty. Gen., and Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

Allen G. Nelson, of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendant and appellee; Ronald Clabaugh, of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, on the brief.

DOBBERPUHL, Circuit Judge.

Plaintiff, State of South Dakota, has appealed from an order of the Circuit Court, Seventh Judicial Circuit, that granted defendant's motion to suppress certain evidence. Defendant, Daniel DuBois, was charged with the crime of first-degree manslaughter. We reverse and remand.

Defendant is a Sergeant in the United States Air Force. He joined the Air Force on June 2, 1972, has been in the service since that time, and presently plans on making the service his career. His father was a member of the Air Force for twenty-one years. Defendant's superiors have testified that defendant's past military record is impeccable. He has received certain high honors in the past. Defendant has been stationed at Ellsworth Air Force Base near Rapid City since January 3, 1977.

Michele Earhart, a twelve-month-old baby girl, passed away on the night of September 30, 1977. An autopsy of the body revealed the cause of death to be a ruptured intestine complicated by a hemorrhage around the base of the brain. Expert medical testimony indicated that either injury by itself probably would have caused the death.

On October 1, 1977, Deputy Sheriff Phillips visited defendant and his wife at their residence because it had been discovered that they had been babysitting the child the day it died. Neither defendant nor his wife gave any indication that they were involved in any way with the child's death. The parents of the deceased child consequently became the primary suspects.

Defendant's wife voluntarily called the sheriff's office the next day, October 2, 1977, and indicated that she and defendant had not told the entire story to the deputy sheriff the day before. As a result of this conversation, defendant later informed Deputy Sheriff Holloway that he had accidentally stepped on the baby's stomach on the afternoon of the day it died. Defendant was advised that a criminal investigation was being conducted concerning the child's death and that he might be asked at a later date to take a polygraph examination. Defendant's wife contends that at this point she asked Deputy Sheriff Phillips if she and defendant were in any trouble and if they needed an attorney. She claims

that Deputy Phillips told her "no." However, neither Deputy Sheriff Phillips nor Deputy Sheriff Holloway recalls any such conversation.

Because Deputy Phillips felt that it was not possible for the accident to have occurred in the manner in which defendant described it, he arranged, with the permission of defendant, for an interview with defendant and his wife at the DuBois' residence on October 14, 1977. Prior to attending this interview, Deputy Phillips purchased a doll of approximately the same size as the deceased child for the purpose of aiding in a demonstration of how the child had been injured.

Following this interview and demonstration on October 14, 1977, Deputy Phillips indicated to defendant that he still had some doubts as to whether or not defendant was telling the truth. Neither before, during, or after this demonstration was defendant informed of his *Miranda* rights. Deputy Phillips asked defendant if he would, of his own free will, come down to the sheriff's office and voluntarily submit to a polygraph examination *so* that the matter might be cleared up. Defendant indicated that he would voluntarily do so. Defendant claims that following this conversation his wife once again raised the question whether or not they were in trouble and whether or not they needed an attorney. Defendant then voluntarily drove his own car to the sheriff's office, accompanied only by his wife.

When defendant arrived at the sheriff's office he was not placed under arrest or any type of physical restraint. He voluntarily went into the polygraph room, accompanied only by the polygraph examiner. The examiner then explained to defendant how the polygraph worked and read him his *Miranda* rights from a prepared card. Defendant contends that when the examiner read the portion of the *Miranda* warning pertaining to an attorney, defendant then asked the question, "What about an attorney?" Defendant further contends that the only response he received to this question was that a lawyer would be appointed for him by the court if he could not afford one. The polygraph examiner testified that this conversation concerning an attorney could possibly have taken place, but that he did not recall such a conversation. The examiner did recall specifically informing defendant of each of his rights under the *Miranda* ruling and stopping after each one to inquire of him whether or not he understood it. The examiner testified that defendant indicated after each right that he understood it. Defendant was thus advised prior to the test of his right to remain silent, and there was evidence that defendant was informed not once but twice that he did not have to take the test if he chose not to, and that no one could force him to take the polygraph examination. The examiner testified that he felt very strongly that everyone who takes a polygraph examination should be informed in advance that they cannot be compelled to do so; that if they submit to such an examination, they do so of their own volition, and that he told defendant of this right.

Prior to submitting to the polygraph examination, defendant voluntarily signed an agreement, State's Exhibit No. 9, which reads as follows:

I, Daniel J. DuBois do hereby voluntarily, without duress, coercion, promise of reward or immunity, submit to a Polygraph (Lie Detector) examination, having had said technique explained to my satisfaction; and hereby release Mel Larson, Sheriff and the Examiner administering this examination from all claims resulting from, or arising out of this examination.
WITNESSED BY:
/s/ Dave Bintliff
10–14–77
3:51 p. m.
    /s/ Daniel J. DuBois
    PERSON BEING EXAMINED

Defendant contends that prior to signing State's Exhibit No. 9 above, he asked Deputy Bintliff, the polygraph examiner, about calling his uncle, a sheriff in North Dakota. Deputy Bintliff testified that he does recall defendant saying something to the effect that he should call his uncle to see what he

should do or words to that effect. When asked at the suppression hearing how he responded, Deputy Bintliff testified that he did not respond at all, that "there was no request or anything." No one at any time told defendant that he could not seek an attorney or other advice, and no one attempted to restrain him or otherwise prevent him from doing so.

The only persons in the examination room during the testing were defendant and the polygraph examiner. They were in the testing room about one and one-half to two hours, but this includes the preliminary explanation of how the exam works, the reading of defendant's rights, and the preliminary "pre-test" interview consisting of gathering medical and historical information about defendant, as well as the actual testing itself.

At some point during the examination, defendant asked if he could have a glass of water. The examiner asked if he would wait until the test was over, because defendant had already been hooked up to the polygraph machine.

After the polygraph examination, the examiner left the room to analyze the results, leaving defendant alone in the examination room. When the examiner returned, he told defendant that he had failed the test miserably and asked him if there was something about which he had not told the truth. The examiner indicated that it was necessary for defendant to tell him the truth in order for them to clarify the test results. Defendant then became emotional and made certain inculpatory statements indicating that his stepping on the child may not have been accidental. The examiner left defendant alone in the room once again in order to get an officer who could take defendant's statement. Defendant was asked prior to the taping of his statement if it would be all right with him if it was taped. He was also asked, prior to giving his statement, if he had been advised of his constitutional rights and if he was giving the statement of his own free will. Defendant answered "yes" to all three questions.

Defendant then gave an incriminating verbal statement that was tape-recorded and later transcribed. Defendant was placed under arrest at the conclusion of his statement.

By an order dated December 7, 1978, the trial court suppressed any inculpatory statements made by defendant at his residence on October 14, 1977, in the presence of Officers Holloway and Phillips; any inculpatory demonstrations made by defendant at the request of Officers Phillips or Holloway; and any and all statements made by defendant during or after the polygraph examination on October 14, 1977.

One of the factors that contributed to the granting of the motion to suppress was the expert testimony of a psychiatrist, Dr. Donald W. Burnap. Dr. Burnap testified that it was his opinion that defendant's statement was not voluntarily given because defendant's personality, upbringing, military background, and the setting that he was placed in caused his will to be overcome by the authority figures, the law enforcement officers, to the extent that he would do basically whatever they asked of him.

█ In deciding the issue whether or not the trial court erred in granting defendant's motion to suppress certain evidence, this court must consider the evidence in the light most favorable to support the trial court's decision. *State v. Kiehn,* 86 S.D. 549, 199 N.W.2d 594 (1972). Moreover, when a confession or incriminating statement allegedly made by an accused is offered by the prosecution and objected to, the state has the burden of proving beyond a reasonable doubt that the same was freely and voluntarily made. *State v. Thundershield,* 83 S.D. 414, 160 N.W.2d 408 (1968). Finally, once the trial court has made a finding on whether or not a certain statement was voluntarily given, that finding is binding on this court unless such finding is clearly erroneous. *State v. Lyons,* 269 N.W.2d 124 (S.D.1978); *Mobridge Community Industries v. Toure,* 273 N.W.2d 128 (S.D.1978); *State v. Lewis,* 244 N.W.2d 307 (S.D.1976).

■ The law is well settled that any suspect who is to be taken into custody or otherwise deprived of his freedom in any significant way must be informed of his constitutional rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, the law is also well settled that in the absence of such a custodial situation, law enforcement officials are not required to give the *Miranda* warning at the outset of an interrogation.[1] *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Matter of V. R.,* 267 N.W.2d 832 (S.D.1978). Law enforcement officers do not have to give *Miranda* warnings to everyone they routinely question during the course of an investigation. The fact that a deputy sheriff may have given a suspect poor advice in stating his personal opinion about whether or not that person needed a lawyer loses all significance if the statement was made at a time when the deputy sheriff was not required to advise that person of his rights.

The record in this case reveals that the trial court made an erroneous application of the law under the *Miranda* decision. The trial court appears to have been overly concerned with the fact that defendant or his wife may have asked, prior to defendant's coming down to the police station to take the polygraph examination, whether or not defendant needed an attorney. These questions were asked, however, at a time when the law enforcement officers were not required to advise defendant of his rights under *Miranda.*

In *Miranda,* supra, the Supreme Court of the United States said:

The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way. . . . Under the system of warnings we delineate today or under any other system which may be devised and found effective, the safeguards to be erected about the privilege must come into play at this point.

384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed.2d at 725.

■ When the deputy sheriffs went to defendant's home on October 14, 1977, they did so with the express permission of defendant himself. During this time defendant was not in custody and did not have his personal freedom of action restricted in any manner. In fact, defendant could have asked the deputy sheriffs to leave his house at any time. Under these circumstances the deputy sheriffs were not required to advise defendant of his rights under the *Miranda* decision. It should be noted here that defendant had at least two full weeks after he became aware that he may have been a suspect in which he could have hired an attorney, had he seen fit to do so. The record is completely devoid of evidence showing any attempt by anyone to interfere with this right of defendant. No one ever restricted or attempted to restrict his freedom of action in this regard.

■ When defendant and his wife voluntarily drove down to the sheriff's office to take the polygraph examination, defendant was read his *Miranda* rights from a prepared card. Defendant was asked after each right whether or not he understood it, and he answered affirmatively each time. This was done prior to his giving the incriminating statement. He came to the sheriff's office of his own free will, and he was free to leave at any time prior to giving this statement. It was only after he gave his statement that defendant was taken into custody or otherwise had his freedom of action restricted in any manner. Demands were never made upon defendant, but merely requests, and defendant voluntarily complied with these requests. Defendant at all times had the freedom of action to prevent anything and everything that happened to him during the course of this

---

1. This court very recently decided this same question in *Matter of M. J. B.,* 284 N.W.2d 874 (S.D.1979).

criminal investigation. Defendant himself testified under oath that he was not under any physical restraints at the sheriff's office that would have prevented him from calling an attorney or leaving the office. Consequently, the circumstances surrounding this confession do not contain the evils that the *Miranda* decision sought to guard against.

With regard to the issue of whether or not the confession was voluntarily given, this court holds that the finding by the trial court that the confession was involuntarily given is also clearly erroneous. The only evidence in the record that supports the trial court's findings appears to be the testimony of the psychiatrist, Dr. Burnap, and even this testimony is contradicted by the facts and by defendant's own words. Prior to giving his statement, and as a part of the statement, defendant was asked if he was giving the statement of his own free will and if he had been advised of his constitutional rights. These were two separate questions, and defendant answered "yes" to both. Then, at the suppression hearing, defendant testified under oath that at the time he made the statement he did not feel he was being coerced. It was only later that he began to feel that he had been coerced into making the statement. We conclude that it was erroneous for the trial court to make a finding in accordance with the personal opinion or conclusion of a psychiatrist when such finding is contradicted by the facts and by the statements that were made by defendant himself.

We further observe that not only was this defendant read his constitutional rights prior to taking the polygraph examination, but he admitted at the suppression hearing to having been informed of his constitutional rights on a prior occasion. Furthermore, defendant testified that the only reason he felt he had to take the polygraph examination was because he thought it was necessary in order to "clear things up."

As evidenced by his military record, defendant is a bright young man. He is a Sergeant in the Air Force and consequently has to make decisions and think for himself.

Also, he is accustomed to being around superior officers and other authority figures. He comes into contact with such persons every working day of his life.

For the reasons set forth above, the order of the trial court suppressing evidence is reversed, and the case is remanded to the trial court for further proceedings.

All the Justices concur.

DOBBERPUHL, Circuit Judge, sitting for HENDERSON, J., disqualified.