STATE of South Dakota, Plaintiff and Appellee,

v.

John PERKINS, Defendant and Appellant.

No. 16337.

Supreme Court of South Dakota.

Argued March 20, 1989.

Decided July 12, 1989.

Ron Campbell, Asst. Atty. Gen., Pierre, On the brief: Karen E. Cremer, Asst. Atty. Gen., and Roger A. Tellinghuisen, Atty. Gen., Pierre, for plaintiff and appellee.

Gregory G. Rediger, Miller, for defendant and appellant.

HENDERSON, Justice.

### PROCEDURAL HISTORY/ISSUES

Defendant John Perkins (Perkins) was charged by information with three counts of second-degree rape, under SDCL 22–22–1(5), stemming from three incidents involving a female minor. After a Hand County jury convicted Perkins on all three counts, the trial court imposed a sentence of fifteen years in the State Penitentiary and a $10,000 fine for each of the three convictions (total: 45 years, $30,000 in fines). The three sentences were to be served consecutively. Perkins, aged twenty-seven at the time of his trial, appeals his convictions and sentences, alleging that the trial court erred in three regards:

I Admission of evidence concerning other bad acts;

II Admission of testimony from a Sheriff regarding incriminating statements made by Perkins in violation of his right against self-incrimination; and

III Imposition of three consecutive fifteen-year sentences and $30,000 in fines constituted cruel and unusual punishment.

We affirm.

### FACTS

The charges against Perkins stem from three sexual encounters with a young girl, D.J.K., all of which took place within the defendant's dwelling. D.J.K. testified that Perkins penetrated her vagina on each occasion, as follows:

—Incident 1—

In the summer of 1982, twelve-year-old D.J.K. went to Perkins' trailer house to visit his wife Donna, who was not home at the time. Perkins asked D.J.K. if she wanted "to mess around" and, despite her negative answer, proceeded to kiss her, fondle her breasts, and move his finger in and out of her vagina. He desisted after hearing a car outside and instructed her not to tell anyone. D.J.K. gave her mother an edited version of the event, saying only that he had grabbed her breasts.

—Incident 2—

The next encounter occurred in June or July, 1984, when D.J.K. was fourteen years old. Perkins called her at home and arranged for her to baby-sit for his children that night. As D.J.K. lived a distance away, she stayed overnight, and slept on a couch in the living room after Perkins returned from a bar with an unidentified woman (his marriage to Donna had ended in divorce). During the night, Perkins entered the living room, which was lit by a light in the kitchen, sat down on the couch, and began rubbing D.J.K.'s breasts. He inserted his hand under her clothes and moved his fingers in and out of her vagina. He then pulled off her clothing, had conventional intercourse with her, and ejaculated on her stomach.

—Incident 3—

Perkins' last sexual adventure with D.J.K. happened in February or March 1985, when D.J.K. was fifteen. He again hired her as a baby-sitter. At this time, Perkins was married to a new wife, Barbara, and was living in the basement of her parents' home. D.J.K. again stayed overnight, and slept on a couch. During the night, she arose to go to the bathroom, but was followed into the bathroom by Perkins. He asked her if she wanted "to mess around," as he had in the 1982 incident, and, despite her refusal, started kissing her and rubbing her breasts. As in the earlier incidents, Perkins penetrated her vagina with his fingers. He then took her hand, placed it on his penis, and showed her how he wanted her to manually stimulate him. She performed the desired act, which culminated in his ejaculation.

—BAD ACTS TESTIMONY—

D.J.K.'s testimony was followed by that of two additional young girls, M.K., D.J.K.'s younger sister, and P.B., who is not related to the other girls. M.K. recounted three separate instances of sexual contact with Perkins: 1) In 1984, at age thirteen, after babysitting at Perkins' trailer, he sat

on the couch she was sleeping on, touched her breast, grabbed her hand, moved it toward his penis, and stopped after she pulled her hand away; 2) in 1985, at age fourteen, after babysitting for Perkins in Eckstein's basement, he sat on the couch with her and started rubbing her breasts, desisting only when she began to scream; and 3) in 1986, when she was fifteen, at his residence at Lake Byron, Perkins put a hand on her breast, reached for her vagina, saying "oh, love me, love me," and stopped after she kicked him and reminded him of his crying, pregnant wife, who was in another room.

P.B.'s testimony recounted an incident which happened in 1986, when she was fifteen, during an overnight stay at Perkins' trailer. While sleeping on a couch, she was awakened by Perkins, who sat down, whispering unintelligibly. He took her hand and moved it to his penis, at which point she jerked her hand from his grasp. He then left, after telling her that he would leave her alone.

Before and during trial, defense counsel made motions to suppress the "bad acts" testimony of M.K. and P.B., but the trial court declined to do so. The trial court entered findings of fact and conclusions of law to the effect that the "bad acts" testimony demonstrated, by clear and convincing evidence: 1) An intent to commit the acts charged; 2) a plan; 3) identity; 4) a course of continuous criminal action against young women engaged in a babysitting capacity; and 5) motive, opportunity, preparation and knowledge regarding commission of the acts charged. As a matter of law, the trial court concluded that the testimony was relevant to material issues, and that its probative value was not substantially outweighed by the danger of unfair prejudice to the defendant. Hence, the bad acts testimony was admitted.

—INCRIMINATING STATEMENTS—

Perkins also submitted a pretrial motion to suppress statements he made during conversations with Sheriff Chuck Fechner.

Although a suppression hearing concerning such statements was apparently held on May 19, 1988, no transcript of the hearing was included in the record for this Court's review. The trial court's findings of fact and conclusions of law, memorandum opinion incorporated into such findings and conclusions, and the Sheriff's memoranda of the meetings indicate that three conversations were at issue: 1) An interrogation by the Sheriff, lasting forty-five minutes to an hour, on September 3, 1987, during which Perkins denied touching the breasts or vaginas of D.J.K. and M.K., and stated that he did not remember taking their hands and placing them on his penis; if the latter happened, then he must have been "in a trance or sleepwalking." The second interview took place on September 25, 1987, at which time Perkins denied any wrongdoing and repeated his sleepwalking or trance assertion. According to Sheriff Fechner, Perkins also claimed that D.J.K. tried to follow him into the bathroom at his in-laws' residence, and that he simply told her to wait outside. Perkins was given *Miranda* warnings before this second interview, and appears to have waived counsel and spoken voluntarily. A later conversation with the Sheriff, which occurred while Perkins was in a car being transported, was not used at trial by agreement of the parties.[1] At trial, Perkins' statements from the first two interviews were used for impeachment and rebuttal purposes.

Regarding the sentences Perkins received, we again note that this Court has been provided with no transcript. Perkins received the statutory maximum sentence for each count, and $10,000 of a possible $15,000 fine for each count.

## DECISION

### I. BAD ACTS

 The bad acts testimony of M.K. and P.B. was admissible under SDCL 19–12–5, which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the char-

---

1. The only incriminating aspect of this third conversation was Perkins' statement that he did not recall doing anything to the girls, but that he was drinking a lot at the time.

acter of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The challenged testimony demonstrates a consistent pattern of molesting young girls with whom Perkins was long acquainted, when they were within his home. In each instance, Perkins approached the victim, and began fondling their breasts. Between the charges stemming from the D.J.K. incidents, and the four acts involving the other girls, a total of seven sexual encounters were presented. In four of the seven, the victim was present in the home as a babysitter staying overnight. In a fifth, the P.B. incident, the victim was spending the night after staying late to help Perkins' wife with a new baby, i.e. babysitting. Although Perkins asserts that the incidents involving M.K. and P.B. were so different as to be irrelevant, the factual patterns are remarkably similar. The only real difference between the bad acts and the rape incidents is that D.J.K. made no physical act to stop Perkins, whereas P.B. and M.K. did. Circumstances which surrounded the various acts and Perkins' behavior up to the point of physical resistance (which D.J.K. did not offer) are virtually the same. Perkins was not charged and convicted with a singular crime, based upon prior criminal or "wrong" conduct as the dissent of Sabers, J., postulates; rather, Perkins was charged with a series of criminal acts reflecting a plan to engage in sexual activity with very young girls. These acts typified the same plan toward underage victims which this Court determined was admissible in *State v. Dace,* 333 N.W.2d 812, 816 (S.D.1983).

This defendant has no more valid complaint about evidence of his "other acts"

than Roden did in *State v. Roden,* 380 N.W.2d 669 (S.D.1986).[2] Roden sexually assaulted little girls within his household. Perkins sexually attacked little girls in his house. This evidence was not unfairly prejudicial because its effect resulted from legitimate probative force of the evidence; there was no unfair advantage from persuasion by illegitimate means. *State v. Kerkhove,* 423 N.W.2d 160, 163 (S.D.1988). As in *State v. Means,* 363 N.W.2d 565 (S.D.1985), Perkins preyed on those whose families trusted him.

■ Nor does Perkins have grounds for reversal because of temporal remoteness. Determining the remoteness of other acts must realistically depend upon their nature. In *Means,* 363 N.W.2d at 568–69, this Court affirmed introduction of a prior bad act three years prior to the act charged, a greater time lapse than presented here, where the charged acts occurred in 1982, 1984, and 1985, whereas the other bad acts occurred in 1984, 1985, and 1986. On these facts, the trial court did not abuse its discretion.

■ The issue of intent was raised, through Perkins' statements to police that he may have been unconscious when the events took place (sleepwalking or trance state). Even if rape is a general intent statute, *State v. Houghton,* 272 N.W.2d 788 (S.D.1978), a claim of unconsciousness would be a defense making intent an issue (the trial court gave instructions on unconsciousness). Where a defendant claims innocence by a mitigating factor, "he thus begets the establishment of intent as a material issue in the crime of rape." *State v. Willis,* 370 N.W.2d 193, 198 (S.D.1985). Common features show a plan or scheme, and are relevant to intent. *Id.*[3]

■ The trial court found the testimony of M.K. and P.B. to be relevant, *State v. Pedde,* 334 N.W.2d 41 (S.D.1983), a rele-

---

2. *See, also, Roden v. Solem (Roden II),* 431 N.W.2d 665, 670–1 (S.D.1980) (Henderson, J., specially concurring; Sabers, J., dissenting); *State v. Champagne,* 422 N.W.2d 840, 844 (S.D. 1988) (Henderson, J., specially concurring; Sabers, J., dissenting). Both were pedophilia cases.

3. *Willis* involved isolation of retarded women by an official using his position of authority; it was authored by Henderson, J., joined by Chief Justice Fosheim, Justice Wollman, Justice Morgan, and then Acting Justice Wuest (now Chief Justice).

vance not outweighed by unfair prejudice, *Thomas*, 381 N.W.2d 232, 237 (S.D.1986), and not too remote. *State v. Johnson*, 316 N.W.2d 652 (S.D.1982). We find no abuse of discretion here.[4] The standard of review on abuse of discretion in admitting evidence of other criminal wrongs, or other bad acts, was set forth in *State v. Rose*, 324 N.W.2d 894, 895 (S.D.1982). As recently written by Justice Sabers, on behalf of this Court, in *State v. Titus*, 426 N.W.2d 578 (S.D.1988), "bad acts" evidence is to be admitted in proper cases, for proper use (eight-year-old previous burglary conviction admitted).

## II. SELF–INCRIMINATION

Perkins claims that statements he made to Sheriff Fechner were involuntary or coerced, and thus acquired in violation of his rights against self-incrimination. We disagree.

The lack of a transcript of the suppression hearing is a hindrance. As the State quotes: "The settled record is the sole evidence of the circuit court's proceedings and, when confronted with an incomplete record, our presumption is that the circuit court acted properly." *State v. Jones*, 416 N.W.2d 875, 878 (S.D.1987); *State v. Garton*, 390 N.W.2d 61, 63 (S.D.1986); *State v. Wilson*, 297 N.W.2d 477, 482 (S.D.1980). Perkins, as the party claiming error, had the responsibility to insure that a record was made. *Jones, id.; Garton, id.; Wilson, id.* This Court is now asked to rule in a factual vacuum, beset with conflicting factual claims which we cannot assess, as where the State argues in its brief that Perkins testified at the suppression hearing, and Perkins asserts in his brief that he did not.

The facts we may glean as revealed in the record, namely, the trial court's memorandum opinion, findings of fact and conclusions of law, and the Sheriff's written memoranda of the conversations in question, provide little justification for Perkins' claims.

Perkins' first meeting with Fechner on September 3, occurred after Fechner had telephoned Perkins' mother, ascertained that he was at a fair, and informed her that he wanted to speak to Perkins and that he would be in touch with Perkins later. Perkins then went to the station on his own to meet with Fechner. Fechner gave no *Miranda* warnings, and Perkins was, apparently, under no restraint. There is no indication that Perkins was not free to go. The mere fact that investigation had focused on Perkins does not render an interrogation custodial. *United States v. Goudreau*, 854 F.2d 1097, 1098 (8th Cir. 1988). Under *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), *Miranda* warnings are not required simply because questioning takes place in a station house or the questioned person is one the police suspect. *Miranda* implicitly defined "focus" for its purposes as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of freedom of action in any significant way. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). The law is well settled that in the absence of such a custodial situation, law enforcement officials are not required to give *Miranda* warnings. *State v. DuBois*, 286 N.W.2d 801, 805 (S.D. 1979).

> The proper test in determining whether a person need be given the *Miranda* warning is not whether the investigation has focused on any particular suspect, but rather, whether the person being questioned is in custody or deprived of his or her freedom to leave.

*State v. Bruske*, 288 N.W.2d 319, 322 (S.D. 1980).

---

4. *State v. Chief Eagle*, 377 N.W.2d 141 (S.D. 1985) (Henderson, J., dissenting), cited in the dissent, pertained to extrinsic evidence of specific acts, which were held inadmissible under SDCL 19–14–10, but deemed harmless error by the majority. SDCL 19–14–5, at issue here, was not at issue in *Chief Eagle*. *State v. Wedemann*, 339 N.W.2d 112 (S.D.1983) (Henderson, J., dissenting), was strikingly dissimilar in facts, same being an arson case, wherein the dissent centered on the remoteness of past fires. There was no remoteness as to the three counts of second-degree rape herein.

The State has the burden of proving beyond a reasonable doubt that a confession or incriminating statement made by an accused, offered by the prosecution and objected to, was freely and voluntarily made. *DuBois, id.* at 804. The trial court here, after hearing, determined that Perkins' statements were voluntary, and made in a noncustodial setting. Perkins suggests no facts to persuade us that the trial court's determination was clearly erroneous (see *DuBois, id.*).

Factors in determining whether an interrogation is custodial include: Probable cause to arrest; subjective intent of defendant; focus of the investigation; nature of the interrogation; nature of the suspect; time and place of the interrogation; and purpose of the investigation. *State v. McQuillen*, 345 N.W.2d 867, 870 (S.D.1984). The accusatory nature of the September 3 interrogation, location, and focus on Perkins (focus is a factor, only, not decisive in itself) arguably support Perkins' argument, but all other indicia of arrest or custody are absolutely lacking. Perkins came of his own accord, and left of his own accord. No violation of Perkins' right against self-incrimination occurred.

At the second meeting, Perkins was given *Miranda* warnings. Any argument Perkins has about that interview is totally strained.

## III. SEVERITY OF PUNISHMENT

Perkins' last argument is that his sentence, the statutory maximum of fifteen years for each offense, was too harsh. Again, there is no transcript of the sentencing hearing. It is, therefore, difficult to review Perkins' complaint, which is that his sentence should shock the conscience of this Court.

The cases cited by Perkins do not favor his argument. He concedes that his sentence is within statutory limits, and that he was convicted of very serious crimes. Yet, he advocates that he is entitled to a break at sentencing because one of his child victims thinks he is a "neat person whom she respects". This latter statement is less a reflection on this defendant's merit than an indication of why statutory rape is an offense. Little girls do not know any better. His argument that goals of punishment are not served by giving him a long sentence is contrary to the very cases he cites, as they indicate that retribution and deterrence are both valid goals.[5] *See, Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Perkins has also failed to show any disproportionality between (1) the gravity of his offense and harshness of the penalty; (2) his sentence and others imposed on others in this jurisdiction; or (3) sentences imposed in other jurisdictions. *See Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). No statistics or data were produced.

If this sentence is not excessive or disproportionate to the crime, and shocks the conscience neither of men generally, nor of this Court, the sentence passes constitutional muster. *State v. Big Head*, 363 N.W.2d 556, 563–65 (S.D.1985) (Henderson, J., specially concurring). We recognize that the sentences are severe but conclude, also, that they do pass constitutional muster.

Affirm.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

SABERS, J., dissenting.

SABERS, Justice (dissenting).

The trial court allowed in evidence subsequent bad acts against two baby-sitters for *every one* of the reasons under SDCL 19–12–5. In addition, the balancing of prejudice against probative value was extremely superficial. The State's brief even argues that "identity" was an issue because Perkins denied the charges. If this statement were true, why would the statute waste its time even referring to the other reasons, i.e., all other bad acts would always be

---

**5.** We recognize that these are not the only two goals, and observe that rehabilitation is also a goal.

admissible unless defendant admitted the charges, and then the evidence would not be needed. As stated in my dissent in *State v. Champagne,* 422 N.W.2d 840, 846 (S.D.1988):

> [I]t is clear that fair trials require a new interpretation of SDCL 19–12–5. We must stop allowing the first sentence of SDCL 19–12–5 from being "entirely swallowed up by the second sentence." [1]

We have come a long way the wrong way in a short time on "prior bad acts." In 1986, in his concurring opinion in *Rufener I, supra* at 429, Justice Morgan wrote:

> SDCL 19–12–5 has been much abused by this court. The first sentence: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith" has been entirely swallowed up by the second sentence.... I think that the trial court erred in admitting the evidence under SDCL 19–12–5 and under our holding in *[State v.] Gage,* [302 N.W.2d 793 (S.D. 1981) ].

In the same case, Justice Henderson wrote:

> It appears to me that the bad acts evidence was quite prejudicial. My many dissents on the bad acts evidence rule have been in vain but this does not mean that they have been wrong. *See State v. Chief Eagle,* 377 N.W.2d 141, 147 (S.D. 1985) (Henderson, J., dissenting); and *State v. Wedemann,* 339 N.W.2d 112, 116 (S.D.1983) [2] (Henderson, J., dissenting).

*Rufener I, supra* at 429.

In *Chief Eagle, supra* at 147–48, Justice Henderson wrote:

A man should not be convicted because he is a "bad man"; or, that previously he acted as a "bad man" in a given factual situation for, if convictions were secured in such fashion, the principle that a man may be punished *only* for those acts with which he was charged, would be violated. (emphasis added).

Now, in the majority opinion, we have statements that:

> The bad acts testimony of M.K. and P.B. was admissible under SDCL 19–12–5.... The challenged testimony demonstrates a consistent pattern of molesting young girls with whom Perkins was long acquainted, when they were within his home.... Perkins was charged with a series of criminal acts reflecting a *plan* to engage in sexual activity with very young girls. These acts typified the same *plan* toward underage victims which this Court determined was admissible in *Dace.* (citation omitted) (emphasis added).

The above statements are set forth in the majority opinion despite the fact that the rationale behind SDCL 19–12–5 (the "anti-propensity rule") is: a person should not be convicted of a crime based upon a suggested propensity to act in a criminal manner based upon prior criminal or "wrong" conduct. 2 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 404[04] at 404–29 (1988). Excluding such evidence prevents the trier of fact from inferring the accused's guilt based on his propensity to commit crime. Although this rule of exclusion may be inapplicable when the profered evidence is substantially relevant to a material issue, it should not be done on the basis of facade or pretense, or interchanging or substituting the word or concept of

---

1. *State v. Rufener,* 392 N.W.2d 424, 429 (S.D. 1986) (*Rufener I*) (Morgan, J., concurring specially).

2. In *Wedemann,* Justice Henderson cited Slough & Knightly, *Other Vices, Other Crimes,* 41 Iowa L.Rev. 325 (1956), which begins with the fundamental premise:

> Strongly entrenched among many American traditions is the concept that man should not be judged strenuously by reference to the awesome spectre of his past life. When one

faces trial for a specific crime, he should not be held to answer for the scandal that his earlier vices would most certainly produce....

... Imbedded in these very principles is the constitutional concept that one is presumed innocent until proven guilty, and closely allied is the premise that man should not be judged in light of the abominations of his past.

*Id.* at 116–17 (citations omitted).

plan for propensity. Plan is supposed to mean committing one crime as part of "a larger plan, scheme, or conspiracy, of which the crime on trial is a part," *McCormick on Evidence*, § 190 at 559 (3d ed. 1984), for example, stealing a car as part of a plan to commit a robbery.

As indicated above, we have come a long way the wrong way in a short time in South Dakota. In fact, the anti-propensity rule has in effect become the propensity rule. As previously indicated in my writings,[3] I cannot travel down this road and, therefore, I dissent.

---

3. *See Roden v. Solem,* 431 N.W.2d 665, 671 (S.D.1988); *Champagne, supra* at 844; *see also State v. Klein,* 444 N.W.2d 16, —— (S.D.1989).