**STATE of South Dakota, Plaintiff and Appellant,**

**v.**

**Brian Lou OLTMANNS, Defendant and Appellee.**

**No. 18423.**

Supreme Court of South Dakota.

Argued March 23, 1994.

Decided July 20, 1994.

David R. Nelson, Minnehaha County State's Atty., and Douglas W. Thesenvitz, Minnehaha County Deputy State's Atty., Sioux Falls, for plaintiff and appellant.

Thomas K. Wilka, Hagen, Wilka & Archer, Sioux Falls, for defendant and appellee.

SABERS, Justice.

The trial court held that the State failed to meet its burden of proof beyond a reasonable doubt that Defendant's statements were freely and voluntarily given. State appeals. We affirm.

### FACTS

On July 30, 1992, a fire occurred in the apartment building at 1818 E. 3rd Street in Sioux Falls, South Dakota. Investigation by the Sioux Falls Police and Fire Departments determined the cause of the fire to be arson. Two residents lost their lives as a result of the fire.

Brian Lou Oltmanns (Oltmanns), a resident of the apartment building, was found unconscious inside the apartment building at

the time of the fire. Oltmanns was transported to a local hospital by ambulance and hospitalized for carbon monoxide poisoning, smoke inhalation, and burns. While in the hospital, Oltmanns was interviewed several times by Detective Mark Norlin (Norlin) and Sergeant Mark Moberly (Moberly), both of the Sioux Falls Police Department. These interviews are not before us on appeal.

Oltmanns was discharged from the hospital on August 19, 1992. Norlin contacted Oltmanns at his grandmother's home, where Oltmanns was convalescing, and arranged for a meeting at the Minnehaha County Public Safety Building on August 21. Norlin and Moberly testified that they contacted Oltmanns on August 20 and asked him to come to the Public Safety Building for fingerprinting and further interviewing about the fire and his knowledge of the fire. Jennie Peterson (Peterson), Oltmanns' grandmother, testified however, that Norlin called the morning of August 21 and asked if Oltmanns could come into the police station for fingerprinting. She informed Norlin that Oltmanns was very weak, but Norlin responded that it would only take fifteen minutes.

Oltmanns arrived at the Public Safety Building at approximately 11:00 on August 21. He was accompanied by Peterson. Oltmanns was not placed under arrest, nor was he advised of his *Miranda* rights. Oltmanns was told that he was free to leave at any time.

After an initial twenty to thirty minute interview, Oltmanns was fingerprinted. The fingerprinting took approximately one hour. Following the fingerprinting, a polygraph examination was conducted. Prior to the polygraph, Oltmanns signed a consent form which stated that he voluntarily, without duress, coercion, promise of reward or immunity, submitted to the polygraph examination. Oltmanns was not advised that he could refuse to take the test, discontinue it at any time, or decline to answer any individual questions.

Norlin and Moberly continued to interview Oltmanns for approximately one hour following the polygraph. Oltmanns was again advised that he was free to leave at any time. Norlin and Moberly testified that they made

no threats or promises and everyone's tone of voice was conversational. Oltmanns testified that the officers did not try to make him feel comfortable, were not respectful, and were not polite.

After Oltmanns indicated that he had never lit a match in his life, Norlin and Moberly told Oltmanns that they thought he was lying. Norlin told Oltmanns that there were some things that were left unexplained by the polygraph that needed to be clarified. Norlin also related a story about a person who had been involved in a traffic accident where a person died because of the incident and that this had gnawed away at the person until he finally committed suicide.

During the second interview, Oltmanns stated that he was tired. He got up and walked out of the interview room, then stopped, came back, and stated that he wanted to talk to Norlin. Without reentering the interview room, Oltmanns said that he was sorry about what happened, that it was an accident, and that he did not mean for anyone to get hurt. Norlin went and got Peterson and asked Oltmanns to tell her what had happened. Oltmanns then signed a written statement which stated that "I accidently started the fire with lighter fluild [sic] and match."

After the interview, Oltmanns left with Peterson. Peterson testified that on the way home, Oltmanns told her that he had lied to the officers to get away from them because they made him sick. Oltmanns returned later that day and recanted his statement.

While Norlin testified that Oltmanns did not appear to be ill during the interview, Peterson and Oltmanns testified that Oltmanns was not feeling well generally and that on August 21 he was suffering from diarrhea. Oltmanns was taking Keflex, an antibiotic which, according to testimony by Dr. Brian Hurley (Hurley), can cause fecal incontinence. Oltmanns did fidget in his chair and ask to use the bathroom a few times.

Hurley testified to the residual effects of carbon monoxide poisoning on the body. Neurological residuals include irritability, memory loss, nausea, apathy, headaches, di-

arrhea, and temporary brain dysfunctioning. Hurley was unaware of any psychoneurological damage that existed in Oltmanns but testified that neurological deterioration can occur from a few days to a few weeks after the incident. Sequelae is the medical phrase that is used to describe this delayed reaction to the trauma.

Dr. Michael McGrath, a clinical psychologist, evaluated Oltmanns for vocational rehabilitation and employment purposes in January, 1992, prior to the fire. The results of the evaluation indicated that Oltmanns has an IQ in the dull normal range with some memory impairment which causes sustained comprehension problems. While Oltmanns does not suffer from any mental illness, he is a person with moderate organic mental disorder, borderline intellectual functioning, and cerebral palsy.

Oltmanns was charged by Indictment with two counts of Murder in the First–Degree, two counts of Murder in the Second–Degree and one count of Arson in the First–Degree. Oltmanns entered not guilty pleas to all counts of the Indictment and filed a Motion to Suppress Statements. Oltmanns' Motion to Suppress Statements was denied with respect to the oral and written statements made while in the hospital. His Motion to Suppress Statements was granted, however, with respect to the oral and written statements made on August 21. The State filed a Petition for Permission to Appeal, which was granted.

**Whether, under the totality of the circumstances, the State established beyond a reasonable doubt that the August 21 statements were voluntary.**

A defendant is deprived of due process of law when involuntarily obtained confessions or statements are used against him. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Our system is "an accusatorial and not an inquisitorial system," and the tactics used to elicit incriminating statements must remain within the constitutional boundaries imposed by the Due Process Clause of the Fourteenth Amendment. *Rogers v. Richmond,* 365 U.S. 534, 540–41, 81 S.Ct. 735, 739, 5 L.Ed.2d 760, 766 (1961). "[B]y virtue of the Due Process Clause, 'certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.'" *Colorado,* 479 U.S. at 163, 107 S.Ct. at 519, 93 L.Ed.2d at 481 (quoting *Miller,* 474 U.S. at 109, 106 S.Ct. at 449, 88 L.Ed.2d at 410).

The trial court found, in light of the totality of the circumstances, which included the carbon monoxide poisoning, with the attendant delayed sequelae which may follow, the pre-fire performance on the battery of tests administered by Dr. McGrath, the lifetime history of cerebral palsy, the fact that Oltmanns was feeling ill and weak on August 21 as a result of smoke inhalation, burns, and the medication he was taking, the intimidating nature of a police station interrogation which would exist for any person, the use of the polygraph examination without an advisement of rights, the statements made to Oltmanns by the police including the story of the individual who had committed suicide, and Oltmanns' perception of why he came to the Public Safety Building, that the State failed to prove beyond a reasonable doubt that Oltmanns' statements on August 21 were voluntary.

Our standard of review regarding voluntariness of confessions or incriminating statements is well established. The State has the burden of proving beyond a reasonable doubt that such confessions or incriminating statements were freely and voluntarily made. *State v. Faehnrich,* 359 N.W.2d 895, 898 (S.D.1984); *State v. Janis,* 356 N.W.2d 916, 918 (S.D.1984). If the trial court finds the confession or incriminating statement was voluntary beyond a reasonable doubt, such finding is binding upon this Court unless we conclude from our review of the record that the finding is clearly erroneous. *State v. Albright,* 418 N.W.2d 292, 297 (S.D.1988); *Faehnrich,* at 898, *State v. Headrick,* 357 N.W.2d 268, 270 (S.D.1984). *The trial court must have reviewed the totality of the circumstances surrounding the interrogation. Albright,* at 297; *Faehnrich,* at 898. *See also, State*

v. *Caffrey,* 332 N.W.2d 269 (S.D.1983); *State v. Lyons,* 269 N.W.2d 124 (S.D.1978). In reviewing the trial court's findings on voluntariness, we consider the evidence in the light most favorable to the finding. *State v. Volk,* 331 N.W.2d 67, 70 (S.D. 1983).

*State v. Jenner,* 451 N.W.2d 710, 716 (S.D. 1990) (emphasis added).* *See State v. Dickey,* 459 N.W.2d 445, 447 (S.D.1990).

■ The State argues that the trial court erroneously applied a "but for" analysis rather than reviewing the totality of the circumstances surrounding the interrogation in determining whether the August 21 statements were voluntarily given. According to the State, the "[t]rial [c]ourt reasoned that 'with all else being equal,' that is 'but ·for' the polygraph[,] the statements would be admissible."

"The test for determining voluntariness of incriminating statements or confessions requires a review of the totality of the circumstances." *Id.* (citing *Jenner,* 451 N.W.2d at 716; *State v. Hartley,* 326 N.W.2d 226 (S.D. 1982); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (confession is voluntary if it is made freely and unconstrainedly)). Our review of the trial court's findings of fact, conclusions of law, and memorandum opinion indicates that the trial court correctly reviewed the "totality of the circumstances surrounding the interrogation" in ·determining whether the statements were freely and voluntarily made. The trial court's memorandum opinion supports our conclusion and provides in part:

The final statement occurred at the public safety building. This interrogation has many of the same factors as the hospital interviews except there are some more factors to look at peculiar to that session. *And, it must be kept in mind that the totality of the circumstances is considered*

*to determine whether the officers have overborne the will of the accused.* The factual inquiry centers upon (1) the conduct of law enforcement officers in creating pressure, and (2) the suspect's capacity to resist that pressure. With all else being equal, the Court would find the statements to be admissible. But, the issue of the polygraph and the psychological story must be addressed to determine if Oltmanns' will was overcome improperly. *Colorado v. Connelly,* 479 U.S. 157 [107 S.Ct. 515, 93 L.Ed.2d 473] (1986), *State v. Dickey,* 459 N.W.2d 445, 447 (S.D.1990). *Moreover, an inquiry must be made into the relationship of the polygraph examination and a resulting confession in the overall totality of circumstances analysis.* In other words, if confession is an improper product of a polygraph examination, can other circumstances cure its improper coercion? And, to that question, the South Dakota cases must be reviewed.

(Emphasis added.) *See also* Findings of Fact Nos. 35, 36, 39, 42 and Conclusions of Law Nos. 1, 4, 8, 9, 13, 16–19. The trial court correctly looked to the totality of the circumstances in determining that the State had failed to prove beyond a reasonable doubt that the statements were voluntarily given.

■ The State also argues that the trial court erred in ruling that whenever a polygraph is administered, any resulting statements must be suppressed when the State does not produce evidence that the defendant was specifically warned that a person can refuse the polygraph, discontinue the polygraph at any point, and refuse to answer any individual question.

In *State v. Caffrey,* this court joined the following language from *United States v. Little Bear,* 583 F.2d 411, 414 (8th Cir.1978):

---

* *Compare* Justice Morgan's dissent in *Jenner,* stating that "the principle of considering voluntariness as a factual question is wrong. It should be considered as a mixed question of fact and law." 451 N.W.2d at 726 (Morgan, J., dissenting). "... I think that it is time to recognize the need for a change to what the federal courts denominate a 'plenary review,' because the ultimate issue of voluntariness is a mixed question of law

and fact that should be reviewed as a question of law.... While it may be that the federal court decisions on standards of review are only persuasive and not binding precedent, and the federal courts will still make an independent examination, it seems logical to me that we should take advantage of playing on a level field." *Id.* at 726–27. This position was joined by Justice Sabers.

Owing to the often coercive impact of a lie detector test, full instructions of the suspect's rights should be furnished whenever such examinations are administered to persons under criminal investigation.... As part of the effort to remove or mitigate the pressures toward self-incrimination generated by a polygraph situation, we deem it essential that a person subject to a polygraph examination be apprised, at a minimum, of the rights to refuse to take the test, to discontinue it at any point, and to decline to answer any individual questions.

332 N.W.2d at 273–74 (quoting *Little Bear,* 583 F.2d at 414). Citing *State v. Caffrey,* the trial court's memorandum opinion concludes that, "since no pre-polygraph warnings were given Oltmanns and that since the statements both oral and written occurred after the polygraph, [ ] case law requires the suppression of the August 21 statements." The trial court further concluded, however, that "[b]ased upon the totality of the circumstances, it was not established beyond a reasonable doubt that the August 21, 1992 statements were voluntary." Therefore, it is unnecessary to determine whether the trial court erred in ruling that whenever a polygraph is administered, any resulting statements must be suppressed when the State does not produce evidence that the defendant was specifically warned that a person can refuse the polygraph, discontinue the polygraph at any point, and refuse to answer any individual question.

The State has failed to demonstrate that these findings are clearly erroneous. In view of our affirmance of this issue, it is not necessary to reach the other issues raised by the parties.

MILLER, C.J., and WUEST and AMUNDSON, JJ., concur.

HENDERSON, J., concurs in result.

HENDERSON, Justice (concurring in result).

When is a "signal," as reflected from *The Bluebook: A Uniform System of Citation* (15th ed.1991), a "true signal?" Please observe the majority's footnote pertaining to *State v. Jenner,* 451 N.W.2d 710 (S.D.1990), with the signal *"Compare."* And then, immediately following, a detailed explanation of a dissent in *Jenner,* which was joined by Justice Sabers, who is now the author of this opinion. In my opinion, the footnote unfairly highlights that which has been rejected as the law of this state. It appears that such highlighting is to preserve a supposed vitality in this Court, but vitality it has not.

When *Jenner* was written by this author, our Court was not unmindful of the plenary (de novo) review rule in the federal courts. Historically, South Dakota has not adopted this rule nor should we now. We do not perceive now, nor have we in the past, that the fifty sovereign states have been mandated to follow the plenary review rule. *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

Specifically, in response to Justice Morgan's dissent (joined by Justice Sabers) on the plenary rule, the stare decisis in this Court reveals that our standard of review regarding voluntariness of confessions is well established, as set out in the following cases:

*State v. Albright,* 418 N.W.2d 292 (S.D. 1988) (authored by Justice Miller, joined by Justices Morgan and Henderson, with Chief Justice Wuest concurring in result, and Justice Sabers concurring on voluntariness but concurring in result because of a search warrant issue).

*State v. Gregg,* 405 N.W.2d 49 (S.D.1987) (authored by Justice Sabers, on reassignment, joined by Chief Justice Wuest and Justice Henderson, with Justice Morgan concurring on the suppression issue, and former Chief Justice Fosheim dissenting on a different issue).

*State v. Faehnrich,* 359 N.W.2d 895 (S.D. 1984) (a unanimous opinion authored by Justice Henderson, joined by then Chief Justice Fosheim, Justices Wollman and Morgan, and then Acting Justice Wuest).

*State v. Headrick,* 357 N.W.2d 268 (S.D. 1984) (a unanimous opinion by then Acting Justice Wuest, joined by then Chief Justice Fosheim and Justices Wollman, Morgan and Henderson).

*State v. Janis,* 356 N.W.2d 916 (S.D.1984) (authored by then Chief Justice Fosheim,

joined by Justices Morgan and Henderson, and Retired Justice Dunn, with Justice Wollman dissenting, on application of the facts to the clearly erroneous rule).

*State v. Caffrey,* 332 N.W.2d 269 (S.D. 1983) (authored by Justice Wollman, joined by Justices Morgan and Henderson, with Justices Fosheim and Dunn concurring in result).

*State v. Cowell,* 288 N.W.2d 322 (S.D.1980) (a unanimous opinion authored by Justice Fosheim, joined by then Chief Justice Wollman and Justices Dunn, Morgan and Henderson).

*State v. DuBois,* 286 N.W.2d 801 (S.D. 1979) (a unanimous opinion authored by Circuit Judge Dobberpuhl, sitting for Justice Henderson who was disqualified, joined by then Chief Justice Wollman, and Justices Dunn, Morgan and Fosheim).

*State v. Lyons,* 269 N.W.2d 124 (S.D.1978) (a unanimous opinion written by Circuit Judge Jones, sitting for disqualified Justice Zastrow, joined by then Chief Justice Wollman, and Justices Dunn, Porter and Morgan).

A finding by the trial court that a confession or incriminating statement was beyond a reasonable doubt voluntarily made is binding upon this Court, *unless we conclude our review of the record that the finding is clearly erroneous.* *State v. Hall,* 353 N.W.2d 37 (S.D.1984), written for this Court by Justice Morgan.

You may rub it or scrub it, but the result is the same: In this Court, the scope of review is clearly erroneous.

Our decision in *Jenner* was upheld by the Eighth Circuit Court of Appeals. *Jenner v. Smith,* 982 F.2d 329 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993). As the citation reveals, the United States Supreme Court denied a writ of certiorari thereon.