STATE of South Dakota, Plaintiff and
Appellee/Cross–Appellant,

v.

Debra Sue JENNER, Defendant and
Appellant/Cross–Appellee.

Nos. 16211, 16240.

Supreme Court of South Dakota.

Argued March 20, 1989.

Decided Feb. 14, 1990.

Rehearing Denied March 26, 1990.

Jenner (Abby) was discovered mutilated and stabbed to death in her bed on April 5, 1987. Evidence indicates she tried to ward off her attacker. The Beadle County Grand Jury issued an indictment charging Abby's mother, Debra Sue Jenner (Debra), with one count of second degree murder (SDCL 22–16–7) and one count of first degree manslaughter (SDCL 22–16–15(3)). After a trial in the Circuit Court for Beadle County, the jury found Debra guilty of second degree murder. She was sentenced to life imprisonment. Debra appeals her conviction (Notice of Appeal 16211) denoting eight separate issues which we observe are allegations that the trial court erred in essentially four regards:

I. Debra's motion to suppress her statements made during police questioning, on April 7, 1987, should have been granted;

II. The jury was not correctly instructed regarding unconsciousness, amnesia, and insanity;

III. A state-requested motion in limine regarding third party perpetrator evidence was improperly granted; and,

IV. Evidence was insufficient to support her conviction.

—Holding—

We affirm Appellant's conviction, rejecting her arguments. We do not reach the issues raised by the State's notice of review (16240), wherein the State urges that second degree murder and first degree manslaughter are not alternative counts, as the trial court instructed the jury. We therefore uphold the jury's verdict.

FACTS

Appellant is the wife of Lynn Jenner, (Lynn) and the mother of a daughter, Abby, born November 10, 1983, and a son, Stuart, born July 27, 1982. Abby had an allergy to milk products, and had difficulty sleeping at times. During the evening of April 3, 1987, Abby awoke in the night, requiring the attention of her parents. During a trip on April 4, 1987, she soiled

David R. Gienapp of Arneson, Issenhuth & Gienapp, Madison, for defendant and appellant/cross-appellee, William E. Matheson, Sioux Falls, on the brief.

John W. Bastian, Asst. Atty. Gen., Pierre, for plaintiff and appellee/cross-appellant, Roger A. Tellinghuisen, Atty. Gen., on the brief.

HENDERSON, Justice (on reassignment).

PROCEDURAL HISTORY/ISSUES

This criminal case arose after the body of a three and a half year old girl, Abby

her pants twice. Shortly before 9:00 a.m. on Sunday, April 5, 1987, Lynn entered Abby's bedroom to awaken her. He found her in bed, lying totally still, with her mouth full of blood. He screamed, whereupon Debra came over from the master bedroom, approximately twenty feet away. Debra sat on the edge of Abby's bed and touched her. Abby's body was cold, her eyes dilated. Debra telephoned "911" at 8:59 a.m., gave her address, then relating that a three year old girl was there, with blood and "organs" coming out of her mouth. Debra's tone of voice, during this conversation, was very loud. An ambulance was dispatched.

Before the ambulance arrived, at 9:05 a.m., Debra made an additional telephone call to Doctor Cynthia Kortum, M.D., her family doctor, during which her tone of voice was quite calm. She informed Dr. Kortum, matter of factly, that Abby had died during the night and requested an autopsy. Debra, in the six minutes between her 911 call and the ambulance's arrival, also telephoned her parents, Bruce Schafer and Janet Schafer, and her pastor, Darrel Wagner. At the time the ambulance arrived, she was engaged in still another call, to her friends, the Brink family. The ambulance, her parents, and officer William Ehlers, of the Huron Police Department, arrived at the Jenner home within moments of each other. An emergency medical technician entered the Jenner home, found no signs of life in Abby, and carried her, still enwrapped in bloodstained bedding, out to the ambulance. The ambulance then proceeded to the Huron Regional Medical Center.

The ambulance crew noticed numerous cuts on Abby's body. Later examination revealed that *seventy* stab wounds were inflicted on Abby. Dr. Brad Randall, the forensic pathologist who performed Abby's autopsy, testified at trial that some wounds were of a slashing type, consistent with a blade sharpened on one edge and dull on the other. Other wounds were punctures, which could have been made by a model airplane owned by Stuart which was found next to the sink in the Jenners' kitchen. In particular, the geometry of one wound was described by Dr. Randall as "relatively unique", matching the model plane, as markings around the wound corresponded to a protrusion on the back of the plane and its rear fins. Dr. Randall characterized numerous cuts on Abby's arms and hands as "defensive" in nature, i.e., inflicted as Abby, who laid on her stomach, attempted to fend off the blows. He termed the attack a "frenzy type", evidenced by repeated blows with no particular target. He estimated that Abby died during the early morning hours of April 5, 1987.

No members of the Jenner family accompanied Abby to the hospital. At 9:17 a.m., six minutes after delivering Abby to the hospital, the ambulance driver, Mike Ball, returned to the Jenner home to retrieve equipment. Ball testified that appellant was talking on the telephone normally, in an utterly calm manner. Debra and Lynn went to the hospital only after Janis LaMont, a registered nurse, called them at home requesting information. Once at the hospital, according to LaMont, Debra appeared restless, and paced in the hallway. Lynn stayed in the waiting room, head in hands. Shirley Jenner, Debra's mother-in-law, remarked that she wished Debra would cry. David Bender, a hospital maintenance worker, spoke to Shirley, who was, herself, a hospital worker, for about 20 minutes. At one point, Shirley Jenner left him to converse with Debra. He testified that he heard Debra remark that it was a "screwed-up day", and asked "why couldn't this have been a simple death?" He also heard Debra remark, "I don't know how the hell it happened", in reference to the cuts, wounds and scratches upon Abby's lifeless body. At one point, Debra asked Shirley who Bender was. When Shirley identified him as a hospital maintenance worker, Debra responded: "Oh shit."

While at the hospital, Beadle County Sheriff Tom Beerman (Beerman) spoke to Debra and Lynn. According to Beerman's testimony at trial, he asked Debra if Abby had been sick, and Debra replied that Abby had been "hyper" for a couple of days, that she had stayed up with Abby on Friday night (April 3, 1987), and that Abby had

soiled her pants a couple of times on Saturday afternoon. Debra also related that she checked on Abby at midnight Saturday night, when Abby was asleep, and did not see her again until after Lynn found her the next morning. Debra and Lynn, Beerman was told, then went to bed, only to be disturbed by noise from a party next door. They arose, looked out a window, and watched three intoxicated individuals enter a car and drive away. Per Debra, they then returned to bed and slept until the next morning. Lynn, who discovered Abby's body, informed Beerman that he went into Abby's room to waken her for church, noticed something wrong, turned her over onto her back, and saw blood. He looked in Abby's eyes and knew that she was dead.

Meanwhile, when the Jenners, mother and father of the victim, were at the hospital, Deputy Chief Robert McQuillen (McQuillen) and Sergeant William Ehlers (Ehlers) of the Huron Police Department went to their home. There they found Lynn's father, Merlin Jenner, and Ruby Wagner, wife of the Jenners' pastor. Examining Abby's bedroom, they immediately noticed that her bedding had been replaced. After Mrs. Wagner told him she had already cleaned the room, as she did not want the Jenners to come home and see the mess, McQuillen told those present to leave the room and house alone. McQuillen and Ehlers briefly went to the hospital, and then returned to the Jenner home. They noticed that the bedding in Abby's room had been changed again. McQuillen told everyone to leave. The bedding, not taken to the hospital with Abby, was recovered that morning from defendant's father, Merlin Jenner, who had placed it in his car.

Huron police detective Dave Rand, Dr. Ilya Zeldes, a forensic scientist, and Rex Riis, a criminologist from the State Forensic Laboratory in Pierre, examined the Jenner home later that day. They found no evidence of forced entry. Bloodstains were discovered on the headboard of Abby's bed, on the wall behind the bed, on the bathroom floor, on a wall-mounted light switch in Abby's room and on a telephone near the kitchen. Abby's blood was therefore found

in different parts of the Jenner home. Abby's mattress was turned over before they arrived, with the bloody side facing down. A knife which was consistent with some of Abby's slashing wounds was in a silverware tray atop a microwave oven near the kitchen sink. These officers removed clothing, similar to clothes Debra claimed to have worn to bed on the night Abby was slain, from a hamper next to a washing machine in the basement. No identifiable fingerprints were found.

Debra and Lynn went to Merlin's house after they left the hospital that day. While there, Mary Brink, a family friend, noticed that Debra washed her hands several times that morning. When asked what the problem was, appellant responded: *"I can't get the smell off of my hands."* Debra and Lynn eventually left Merlin's for Debra's parent's home, where Beerman reached them by telephone, sometime after 5:00 p.m. Beerman asked them to come down to his office to be interviewed by Jerry Lindberg (Lindberg), a Division of Criminal Investigation (DCI) agent.

Debra was interviewed by Lindberg for approximately an hour and a half, starting at 8:30 p.m. During this interview, she repeated much of the factual background she had earlier given to Beerman. There was one significant difference, however, as she told Lindberg that she did enter Abby's room that morning just before Lynn discovered Abby's body, but noticed nothing unusual. Also, according to Lindberg's trial testimony, Debra claimed that she could not remember whether the outside doors of her home were locked the night Abby died. Lindberg observed that Debra was very calm and collected during the interview. After the Jenners left, Beerman, Riis, and Dr. Zeldes went to the Jenner's home, where hair and blood samples were given by the Jenners, by consent.

The next day, April 6, 1987, Debra offered to turn over her class ring, which she thrice assured him had not been "scrubbed". As she later testified that she wore it from Saturday night, April 4, through Sunday night, April 5, the ring, per her statements, must have been

washed at least four times while she wore it (three times while at Merlin's house, according to Kay Brink's testimony, and once, additionally, in the bathtub at her home after Lynn discovered Abby's body). During this conversation, she asked Beerman why the police were not checking persons who had been at the party next door. Beerman replied that they were being investigated. Lynn, later that day, turned the ring over to McQuillen and Rand, together with other personal jewelry.

Beerman telephoned Lynn Jenner, on Tuesday, April 7, 1987, and asked that he and Debra come to his office for a few more questions. They agreed and arrived shortly after 2:00 p.m., accompanied by Lynn's parents and their Pastor, Darrell Wagner. DCI agent Lindberg spoke to them together, for five to ten minutes, and asked them to submit to a polygraph test. Lindberg explained that the tests were strictly voluntary, and that the polygraph was used as an investigative tool to help eliminate or generate suspects. Lynn readily consented to testing, and Debra consented after being assured that her grief would not affect the test results. The Jenners were then separated, and DCI agent Fred DeVaney (DeVaney) presented a polygraph consent form to Debra for signature. As she read the form, he advised her that she did not have to take the test, and discussed the test procedure. She signed the consent form. DeVaney then administered the polygraph test, which lasted 90 minutes. During the test, Debra showed no reluctance or hesitation to answer questions. According to DeVaney's trial testimony, Debra theorized that two men had broken into the house and killed Abby. She opined that it had to be two men—one to kill, and one to open doors without getting blood on the doorknobs. Between 3:30 and 4:00 p.m., having finished the test, DeVaney left Debra alone in the room for five to ten minutes, while he reviewed the polygraph charts. The charts indicated that she had been deceptive in her responses. DeVaney asked Lindberg to follow this up.

Lindberg then talked with Debra for 15 to 20 minutes. During this interview, De-

bra admitted past problems with physical discipline upon the deceased child, including one specific incident where she spanked Abby with a wooden spoon so hard that the spoon broke. She also stated that she and Lynn locked their bedroom door at night to prevent their children from crawling into bed with them. When asked if she hurt Abby, she replied: "I don't remember[,]" and "I didn't do this, but I could have psyched out during the night." When asked, outright, if she killed Abby, she simply denied remembering it. At one point, according to Lindberg's trial testimony, she said: "A person could just go click and go in and do this and clean up the mess and not remember it." She denied noticing any smell of blood, even after touching Abby after Lynn found her dead, and related that she noticed nothing unusual when she entered Abby's room immediately before that (at trial, Debra testified that she only glanced at Abby, and focused entirely on the floor when passing around the bed on the way to the closet). During this discussion, Debra's demeanor fluctuated between being calm and visibly upset with great rapidity.

At 4:00 p.m., DeVaney replaced Lindberg and interviewed Debra for another hour. She exhibited no reluctance or hesitancy to continue the interview. According to DeVaney, Debra repeated that she might have "psyched out" and done it, and asked him if he was a psychologist (he was not). She also volunteered to him that she wanted to use any means in DeVaney's words, "to get the truth out of her if she had done it[,]" including the use of a psychologist or hypnosis. DeVaney testified that he left the room at one time, and came back to find that she had gone to the bathroom and returned while he was out. He also procured a Diet Coke for her, after she declined an offered Coca-Cola. At approximately 5:00 p.m., he discontinued his questioning because he perceived that she was looking down on him after he responded negatively to her inquiry as to whether he was a born-again Christian. He asked her if she was willing to continue the interview

with another DCI agent, Ken Giegling (Giegling). She agreed.

During this interview, which lasted until 9:00 p.m., Debra told Giegling that neither her husband nor her son killed Abby. As in the earlier interviews that day, she indicated that she could not recall killing Abby, yet repeated that she might have "psyched out." According to Giegling, Debra asked his help in spurring her memory, and offered to undergo hypnosis, take a "truth serum", or talk to a psychologist to that end. Debra related that, in Giegling's words, "from the start of all this that she has had it in the back of her mind that she could have done this." She also informed him that she was afraid she had committed "this horrible premeditated act[.]" At another point, Giegling testified, she grabbed his hand and told him that she recalled her husband locking the front door of her home on the night in question, a fact that she had told nobody else (she claimed at a later suppression hearing, and at trial, that she could not remember if this memory concerned the night Abby died).

DeVaney also testified that Debra described the killing several times, as seen through Abby's eyes. The first such account came, according to Giegling, without any prompting: Abby was not afraid, knew the perpetrator, trusted the person, and saw a knife, a Chicago Cutlery knife which she had seen before. The second time Debra reconstructed Abby's point of view, she indicated that her own hair was down, and Abby grabbed it. (Analysis of hair samples taken from Abby's hands and arms indicated that these hairs were consistent with samples of either Abby's or Debra's hair, but not Lynn's). Debra related that a black object was in Abby's room at the time, and identified it as a black model airplane which belonged to her son. When asked where the plane was then, Debra informed Giegling that it was on the counter in her kitchen. Giegling then left Debra and informed the police of the model airplane and its location. They found it exactly where Debra said it would be (this is the model plane, the shape corresponding to wounds on Abby's body). Up until that point, the police had been unaware of the model plane. At the suppression hearing and trial, Debra disputed Giegling's account. She testified that Giegling had simply asked if there were any sharp toys in the house, to which she replied by identifying the model and giving its location.

The last time Debra described events in Abby's bedroom for Giegling, she changed her position, stating that a man was standing over Abby's bed with a knife in his hand; further, that he took the knife with him when he left.

At approximately 9:00 p.m., Giegling became concerned with Debra's demeanor, which had been changing throughout the interview. He brought Lynn into the room, and Debra, as Giegling told it, cried out, "I did it, I did it, I did it[,]" which statement her husband then acknowledged by saying "You did it", (Debra and Lynn later disputed Giegling's account on this point, by testifying that she actually said "I did it, didn't I?"). Debra then asked Lynn if he helped her, to which he replied that he had not. She then said: "If you didn't help me how could I do this, clean up and go outside?" No further questioning was undertaken by the police that night.

At Giegling's request, Duane Majeres, a psychologist and counselor was called in to assess Debra's mental state after the police interviews. He found her to be well-oriented and very calm. After this psychological interview she left.

Before trial, Debra moved to suppress all of her statements elicited during the April 7 interviews on the grounds that she was subjected to custodial interrogation without being given *Miranda* warnings and that her statements were involuntary. At a suppression hearing on January 6, 1988, *Debra testified, inter alia, that she had no basis for feeling that she could not leave the police station.* Further, she testified that although she was offered no food during the interviews that day, she was not aware of even being hungry, as she was "concentrating on the other things." The trial court, after issuing detailed findings of fact and conclusions of law, denied the motion to suppress.

Debra's trial lasted from February 24, 1988, until March 15, 1988. The jurors' verdict determined her to be guilty of second degree murder, but not guilty of first degree manslaughter. The court instructed the jury that these were alternative counts.

## DECISION

### Debra's Notice of Appeal (16211)

I. *Suppression of Debra's Statements on April 7, 1987.*

Debra first asserts that the trial court erred in denying her motion to suppress testimony regarding incriminating statements she uttered during the interviews on April 7, 1987. Her argument is two-pronged: 1) The State failed to prove, beyond a reasonable doubt, that her statements were freely and voluntarily made; and, 2) The interviews were custodial in nature, undertaken without benefit of *Miranda* warnings. We reject both arguments.

Our standard of review regarding voluntariness of confessions or incriminating statements is well established. The State has the burden of proving beyond a reasonable doubt that such confessions or incriminating statements were freely and voluntarily made. *State v. Faehnrich*, 359 N.W.2d 895, 898 (S.D.1984); *State v. Janis*, 356 N.W.2d 916, 918 (S.D.1984). If the trial court finds the confession or incriminating statement was voluntary beyond a reasonable doubt, such finding is binding upon this Court unless we conclude from our review of the record that the finding is clearly erroneous. *State v. Albright*, 418 N.W.2d 292, 297 (S.D.1988); *Faehnrich,* at 898; *State v. Headrick*, 357 N.W.2d 268, 270 (S.D.1984). The trial court must have reviewed the totality of the circumstances surrounding the interrogation. *Albright,* at 297; *Faehnrich,* at 898. *See also, State v. Caffrey*, 332 N.W.2d 269 (S.D.1983); *State v. Lyons*, 269 N.W.2d 124 (S.D.1978). In reviewing the trial court's findings on voluntariness, we consider the evidence in the light most favorable to the finding. *State v. Volk*, 331 N.W.2d 67, 70 (S.D. 1983). On this record, we do not deem the trial court's finding to be clearly erroneous. We are not unmindful of the plenary (de novo) review rule in the federal courts. Historically, we have not adopted this rule nor do we now. We do not perceive that the fifty sovereign states have been mandated to follow the plenary review rule. *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). We would not have reached a different result under that rule were it heretofore or now adopted. We have thoroughly reviewed the unique facts and conclude that the totality of the circumstances do not justify a conclusion of involuntariness.

Specifically, in response to Justice Morgan's dissent on the plenary (de novo) rule in this case, the stare decisis in this Court reveals that our standard of review regarding voluntariness of confessions is well established, as set out in the following cases in which current members of this Court participated, namely:

*State v. Albright*, 418 N.W.2d 292 (S.D. 1988) (authored by Justice Miller, joined by Justices Morgan and Henderson, with Chief Justice Wuest concurring in result, and Justice Sabers concurring on voluntariness but concurring in result because of a search warrant issue).

*State v. Gregg*, 405 N.W.2d 49 (S.D.1987) (authorized by Justice Sabers, on reassignment, joined by Chief Justice Wuest and Justice Henderson, with Justice Morgan concurring on the suppression issue, and former Chief Justice Fosheim dissenting on a different issue).

*State v. Faehnrich*, 359 N.W.2d 895 (S.D.1984) (a unanimous opinion authored by Justice Henderson, joined by then Chief Justice Fosheim, Justices Wollman and Morgan, and then Acting Justice Wuest).

*State v. Headrick*, 357 N.W.2d 268 (S.D. 1984) (a unanimous opinion by then Acting Justice Wuest, joined by then Chief Justice Fosheim and Justices Wollman, Morgan and Henderson).

*State v. Janis*, 356 N.W.2d 916 (S.D. 1984) (authored by then Chief Justice Fosheim, joined by Justices Morgan and Henderson, and Retired Justice Dunn,

with Justice Wollman dissenting, on application of the facts to the clearly erroneous rule).

State v. Caffrey, 332 N.W.2d 269 (S.D. 1983) (authored by Justice Wollman, joined by Justices Morgan and Henderson, with Justices Fosheim and Dunn concurring in result).

State v. Cowell, 288 N.W.2d 322 (S.D. 1980) (a unanimous opinion authored by Justice Fosheim, joined by then Chief Justice Wollman and Justices Dunn, Morgan and Henderson).

State v. DuBois, 286 N.W.2d 801 (S.D. 1979) (a unanimous opinion authored by Circuit Judge Dobberpuhl, sitting for Henderson, J., disqualified, joined by then Chief Justice Wollman, and Justices Dunn, Morgan and Fosheim).

State v. Lyons, 269 N.W.2d 124 (S.D. 1978) (a unanimous opinion written by Circuit Judge Jones, sitting for disqualified Justice Zastrow, joined by then Chief Justice Wollman, and Justices Dunn, Porter and Morgan).

A finding by the trial court, that a confession or incriminating statement was beyond a reasonable doubt voluntarily made, is binding upon this Court, unless we conclude from our review of the record that the finding is clearly erroneous. State v. Hall, 353 N.W.2d 37 (S.D.1984), written for this Court by Justice Morgan.

■ The facts of this case, set out at length above, overwhelmingly indicate that Debra participated in the April 7 interviews of her own accord and cooperated fully. She and her husband, accompanied by his parents and the family pastor, came to the police station on their own volition. She was orally advised that the initial polygraph test was strictly voluntary, and that they were under no obligation to talk to the police. This oral warning was given twice, separately, by Agents Lindberg and DeVaney. See, State v. DuBois, 286 N.W.2d 801 (S.D.1979). Debra also signed a polygraph consent form before the test was administered, immediately after DeVaney advised her that she did not have to take the test and explained the process to her. See, State v. Adkins, 88 S.D. 571, 225 N.W.2d

598 (1975). The polygraph test was not used as a psychological threat, or figurative "rubber hose", in the manner proscribed in State v. Caffrey, 332 N.W.2d 269, 272 (S.D.1983). Indeed, this Court, in Caffrey, cited DuBois and Adkins as instances where past-polygraph statements were voluntary. On the facts of this case, the polygraph test did not render Debra's statements involuntary.

Important, also, to our consideration of the totality of circumstances presented here, are Debra's repeated demonstrations of a willingness to participate in the subsequent interviews. The suppression hearing testimony of all three agents who interviewed her reveal cooperation. She specifically suggested, to DeVaney, that she be interviewed by a psychologist or be hypnotized in order to reach the truth. Similarly, during Giegling's interview, she offered to undergo hypnosis, psychological examination, or take a "truth serum" to jog her memory. She asked Giegling to "jar her memory." She exhibited manifestations of voluntariness throughout these interviews, weakening any supposition that her will was overborne. Her subjective intent and state of mind is indicated by her oral expressions to the officers that she wanted to find out what happened to her slain child. Even her emotional state at the end of the interviews does not mandate, by itself, a finding of involuntariness, as even collapse into unconsciousness after a confession might only be a release from the terrible burden of concealing a heinous crime. Miller v. Fenton, 796 F.2d 598, 606, 612 n. 13 (3rd Cir.1986), cert. denied, sub nom, Miller v. Neubert, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587. Mere emotionalism does not necessarily invalidate a confession. Miller, id, at 613.

Further, the April 7 interviews were part of a chain of instances of Debra's cooperation with the police. She signed a consent form allowing police to search her home on April 5. She voluntarily went to the Correction Center on April 5, late in the evening, and submitted to questioning by Lindberg. She voluntarily provided the police with clothing and jewelry, going so far as

to telephone Sheriff Beerman, on April 6, to offer her class ring for analysis. She consented to giving hair and blood samples. We cannot, on this record, hold the trial court's determination of voluntariness to be clearly erroneous. *State v. Gregg*, 405 N.W.2d 49, 52 (S.D.1987). Exhaustive detailed findings were entered below. On other facts, the length of examinations, *see*, *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 520, 93 L.Ed.2d 473, 482 (1986), or her lack of food [1] might support a finding of involuntariness. Here, however, Debra was not *deprived* of rest, refreshment, or relief. *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir.1988). Her age (31), and education (two-year college degree) are factors weighing in favor of the trial court's findings. She was neither young, uneducated or weak-minded, and thus, capable of some degree of resistance to interrogation, had she chosen to resist. *Miller*, at 606.

The second leg of Debra's suppression argument, grounded on lack of *Miranda* warnings, fails because the April 7 interviews were not undertaken in a custodial situation. As noted above, Debra went to the police station voluntarily, was not restrained in any manner during her stay there, and was not taken into custody at any point. *See, State v. Graves*, 83 S.D. 600, 163 N.W.2d 542 (1968). Her own testimony at the suppression hearing indicates that no action by the police gave her any indication that she was not free to go. Morgan, J. in his dissent reflects on this factual issue but one slice of her testimony. She also testified that she had no restraint upon her. The trial judge was in a better position to decide any conflicts in evidence as he was exposed to the conduct, temperament, and demeanor of the witnesses involved. *State v. Brim*, 298 N.W.2d 73, 78 (S.D.1980). It is for the trial court to resolve conflicts in the evidence. *State v. McQuillen*, 345 N.W.2d 867, 871 (S.D. 1984). As the United States Supreme Court observed in *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983):

> Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, *the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.* (emphasis added).

*Beheler* built on a foundation contained in *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), wherein the Supreme Court held that custody or deprivation of freedom to leave was the proper test for determining whether *Miranda* warnings need be given, not mere focus on a suspect. *See also, State v. Perkins*, 444 N.W.2d 34 (S.D.1989); *State v. Bruske*, 288 N.W.2d 319 (S.D.1980). In *State v. McQuillen*, 345 N.W.2d 867, 870 (S.D.1984), we stated:

> This Court has set forth a number of factors to be examined in determining whether an interrogation is custodial or noncustodial: probable cause to arrest, subjective intent of the defendant, focus of the investigation, nature of the interrogator, nature of the suspect, time and place of the interrogation, nature of the interrogation, and purpose of the investigation. (citations omitted).

Here, Debra's subjective intent was clearly to cooperate fully.[2] She, a mature, educat-

---

1. This Court has observed that deprivation of food and sleep, inflicted as punishment, may indicate involuntariness. *See, State v. Hartley*, 326 N.W.2d 226, 230 (S.D.1982) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Here, however, her lack of food was due to lack of appetite, and Debra testified that she was unaware of hunger and asked for no food. A lack of food was self-inflicted. She had a plate of lunch before her on this day and refused it, as she was not hungry; later, at 2:00 p.m., she went to the police station.

2. The trial court's Memorandum Opinion dated January 29, 1989, was incorporated by reference into the formal Findings Of Fact and Conclusions Of Law as reflected in Fact # 18: *"Lynn Jenner testified* that up through and including April 7, 1987, he and the Defendant were fully cooperative including interviews, searches, polygraph tests, and the turning over of jewelry and clothes. During this time no threats or physical violence were made against he or the Defendant." (emphasis supplied ours).

ed adult, was not under any restraint, at any time. Unattended, she left the interrogation room at one point, at which time *she testified that nothing prevented her leaving.* Jenner came and left of her own accord. This totally reinforces that she was not in custody. All these facts lead us to affirm the trial court. This is consistent with *Oregon v. Mathiason,* 429 U.S. 492, 496–7, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977):

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. *But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."* It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited. (emphasis supplied).

In short, Debra was neither in custody nor deprived of her freedom of movement.

Our recent decision in *McDowell v. Solem,* 447 N.W.2d 646 (S.D.1989), page 649 thereof, as regards no *Miranda* warnings on a taped interview of McDowell, is very akin to the case at hand. We expressed therein: "Absent a custodial situation, *Miranda* warnings are not required prior to commencing an interrogation." We cited not only the *Miranda* decision but also *State v. Hall,* 353 N.W.2d 37, 40 (S.D.1984). We noted that McDowell willingly agreed to partake in interviews with the police. We noted that Debra Jenner likewise willingly agreed to participate in interviews with investigative agents here. In *McDowell,* we mentioned that McDowell, in the interviews, would express his opinion and ideas regarding the scheme of execution for the murder of his wife. Here, also,

Debra Jenner had a theory as to the possible murder of her child. In *McDowell,* we mentioned that there were no restrictions on his travel; here, Debra Jenner had opportunity to come and go. In *McDowell,* we held that the taped interviews could be played to the jury "... as the law enforcement officers were not required to give McDowell his *Miranda* warnings prior to these interviews." Therefore, our decision here is consistent with the *McDowell* decision. *McDowell* was a unanimous decision of this Court including the same composed members of this present *Jenner* decision.

■ We note appellant's attack on the conduct of the law enforcement officials involved in the questions to appellant. We express that police coercion, in and of itself, does not invalidate a confession. Further inquiry is necessary, namely, when considering coercion, is the confession still voluntary. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "While the state of the accused's mind, and the failure of the police to advise the accused of [her] rights, were certainly factors to be evaluated in accessing the voluntariness an accused's responses, they were not in and of themselves determinative." *State v. Hartley,* 326 N.W.2d 226, 230 (S.D. 1982), quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Nor does Jenner's emotional condition, on these facts, become determinative, for "mere emotionalism and confusion do not necessarily invalidate" confessions. *Miller v. Fenton,* 796 F.2d 598, 613 (3rd Cir.1986). Here, a distressed woman came to a law enforcement facility and expressed, *inter alia,* that she wanted agent Giegling to "jar" her memory. At 5:00 p.m. on the day in question, she pledged her cooperation. Later, when the officers obtained the truth, she blurted to her husband "I did it." Having found out that she "did it", she now cries out that the officers are guilty of police coercion. If this Court accepts that there was police coercion (to get her to confess), we must still determine if, under the totality of the circumstances, these tactics were sufficient to overbear appellant's free and rational will to thus

render her admissions involuntary. We then must examine her subjective state of mind. Appellant's statements were voluntary, we must conclude, because of the totality of acts and circumstances we have extensively set forth in this opinion, including but not limited to, that she was actually begging the officers to assist her in recalling what happened or who had killed her daughter. In *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 320 (1975) we read that suspects should be given an opportunity to make informed and intelligent assessments of their interests; here, Debra was trying to find out who killed her daughter. Apparently, when she found out that she was the one who had killed her daughter she is claiming that she was not properly Mirandized. Justice Byron White warned against a paternalistic interpretation of the *Miranda* safeguards so as not to "imprison a man in his privileges." 423 U.S. at 109, 96 S.Ct. at 329, 46 L.Ed.2d at 324. Debra had a right to look into *who* killed her daughter and to make an informed and intelligent assessment of that right.

It is necessary to examine the appellant's subjective state of mind to ascertain whether the coercion was sufficient to overbear the will of the accused. *McCall v. Dutton*, 863 F.2d 454 (6th Cir.1988); *see also, United States v. Rohrbach*, 813 F.2d 142 (8th Cir.1987). Further, a defendant must establish that her/his will was overborne because of the coercive police activity in question. If the police misconduct was not the motivating factor behind the defendant's confession, the confession is voluntary and may not be suppressed. *McCall, supra; Hawkins v. Lynaugh*, 844 F.2d 1132 (5th Cir.1988).

The trial court, which carefully considered the suppression issue, as reflected in its voluminous findings, is affirmed on this issue. Debra's statements were voluntary, and *Miranda* warnings were not, on these unique facts, required.

Lastly, we note Justice Sabers' forceful criticism of the majority writer's position in this case, comparing same to a dissent in *State v. Meek*, 444 N.W.2d 48 (S.D.1989).

*Meek* and this case are totally dissimilar in fact. Meek is therefore, inapposite. In *Meek*, we stated: "Officer Hofeldt stopped Meek's vehicle". *Meek* involved field sobriety tests and whether they are protected by the constitutional privilege against self-incrimination. *Meek* was a DUI case, whereas this case involves murder. In *Meek*, it was totally undisputed that Meek claimed his privilege against self-incrimination. He repeatedly did "plead the Fifth Amendment"—in those express words. Here, Debra Jenner never made such a claim. Furthermore, entered findings by the trial court absolutely establish, which is also undisputed, that the Jenners voluntarily traveled to the police station on April 5, 1987; the Jenners also drove to the sheriff's office on April 7, 1987. In *Meek*, we have a stopping of a vehicle on a highway which is known in law as an "investigative stop". Jenners were never "stopped"; they drove to the law enforcement facilities to cooperate. An inconsistency, suggested by Justice Sabers, bears academic scrutiny for correctness.

## II. *Jury Instructions.*

Debra next asserts that the trial court committed errors in instructing the jury as to applicable law in four respects: 1) No instruction was given on the defense of unconsciousness; 2) An instruction on amnesia was improperly given; 3) The jury was not instructed about the insanity defense; and, 4) The jury was improperly instructed on pleas available to Debra. We disagree with all four allegations of error, and discuss them under one heading because all four founder on the same reef—the evidence in the case.

The law in South Dakota is well settled on the point that courts are not required to instruct as to matters which find no support in the evidence. *State v. Weatherford*, 416 N.W.2d 47, 55 (S.D.1987); *State v. Hoadley*, 319 N.W.2d 505, 507 (S.D. 1982); *State v. Johnson*, 81 S.D. 600, 608, 139 N.W.2d 232, 236 (1965). The evidence Debra relies on to support her arguments regarding the defenses of unconsciousness and insanity consists of her statements to the effect that she had no memory of kill-

ing Abby, and that she slept all night (while Abby died). We consider this showing inadequate to require jury instructions on either defense.

The defense of unconsciousness is based upon SDCL 22–3–1, which provides, in pertinent part: "Any person is capable of committing a crime, except those belonging to the following classes: ... (4) Persons who committed the act charged without being conscious thereof[.]" This defense, also known as automatism, *Fulcher v. State,* 633 P.2d 142, 145 (Wyo.1981), is separate and distinct from insanity. *State v. Grooms,* 85 S.D. 532, 186 N.W.2d 889 (1971). "Although related, the defenses of insanity and unconsciousness are not the same in nature, for unconsciousness at the time of the alleged criminal act need not be the result of a disease or defect of the mind." *Weatherford, supra,* at 55 (quoting *State v. Caddell,* 287 N.C. 266, 285, 215 S.E.2d 348, 360 (1975). On the facts of this case, Debra is trying to convert her claimed amnesia into an unconsciousness defense. "It is generally said that amnesia, in and of itself, is not a defense to a criminal charge." *Caddell,* 287 N.C., at 286, 215 S.E.2d, at 360, and amnesia alone does not entitle one to the defense of unconsciousness. *See,* 1 LaFave and Scott, Substantive Criminal Law, § 4.9, at 544 (1986). As in *Polston v. State,* 685 P.2d 1, 8 (Wyo. 1984), not a single witness, medical or otherwise testified to facts that could reasonably raise the defense of automatism, or unconsciousness. The evidence here raises no more than conjecture, which is insufficient to support an instruction to the jury. *Id.* American courts have recognized that an unconsciousness defense might be established when the defendant's condition is brought about by any of a variety of circumstances, including epilepsy, somnambulism, hypnotism, some physical trauma, or even emotional trauma. LaFave and Scott, § 4.9, at 543. Without embracing all of these causes for unconsciousness defenses, we note that no testimony indicated that Debra was suffering from a condition caused by any such circumstances.

There is even less justification for Debra's arguments that she was entitled to an insanity defense. There was no testimony, of any sort, indicating that she was suffering from a mental disease or defect which affected her mental faculties in such a way as to require an insanity instruction. *See, Weatherford, supra,* at 55 (interpreting SDCL 22–1–2(18A), now SDCL 22–1–2(20)). Insanity is statutorily defined as "the condition of a person temporarily or partially deprived of reason, upon proof that, at the time of committing the act charged against him, he was incapable of knowing its wrongfulness, but not including an abnormality manifested only by repeated unlawful or antisocial behavior." SDCL 22–1–2(20). As Debra has presented no evidence of her being incapable of knowing her acts were wrong at the time Abby was killed, the trial court was correct to decline to instruct the jury in that regard.

■ Debra's remaining two jury instruction arguments are without merit. The trial court's instruction on amnesia read: "You are instructed that amnesia or loss of memory is not a defense to a crime." Given the evidence in this case, as noted above, this instruction was a correct statement of the law. If Jenner's amnesia had been linked to evidence indicating that she was suffering from a condition rendering her unable to know the nature of her act and the the act was wrongful, the given instruction would have been incomplete, but such evidence was not presented in this case. As the Supreme Court of North Carolina has written, amnesia is no defense to a criminal charge; that a defendant is subsequently unable to remember is in itself no proof of his mental condition at the time the crime was committed. *State v. Bock,* 288 N.C. 145, 217 S.E.2d 513 (1976). The rationale for this is simple: "Amnesia is a neutral circumstance, or symptom, unless connected to a precipitating cause." *Jackson v. State,* 149 Ga.App. 253, 255, 253 S.E.2d 874, 876 (1979). We find no error here.

■ The last challenge to the trial court's jury instructions is Debra's argument that the trial court erred by instruct-

ing on the various pleas available to a criminal defendant which concluded:

> As stated, the Defendant in this case has entered a plea of not guilty. Therefore, your deliberations should be confined to the determination of whether the defendant killed Abby Lynn Jenner, and, if so, whether she did it in the manner in which she has been charged in either Count I or Count II of the Indictment.

Debra argues that this instruction "appears to be another attempt to make sure ... that the jury did not delve in their deliberations into [un]consciousness and/or insanity[.]" As insanity and unconsciousness were not issues raised by the evidence in this case, we perceive no reason to belabor this point. Further, Debra assails this instruction because it makes no reference to "reasonable doubt" or "general intent," while conceding that these two matters were the subject of separate instructions. The trial court's instructions, when read as a whole, were adequate. This satisfies well settled law in this Court. *State v. Jaques,* 428 N.W.2d 260, 266 (S.D.1988).

III. *Third Party Perpetrator Evidence.*

With a backdrop of admitting that she killed her daughter, appellant contends that a third party could conceivably have killed her little girl. Notwithstanding, we address this argument in legal merit.

■ The trial court excluded third party perpetrator evidence proffered by Debra, granting a pretrial motion in limine on such evidence until Debra made a showing that such evidence satisfied a balancing test set out in *State v. Luna,* 378 N.W.2d 229 (S.D. 1985).

In *Luna,* at 234, this Court adopted a position based upon *Perry v. Rushen,* 713 F.2d 1447, at 1452 (9th Cir.1983) (quoted in *Luna,* at 234):

> When the State interest is strong, only the exclusion of article, reliable and highly probative evidence will violate due process. When the State interest is weaker, less significant evidence is protected.... [T]he court must balance the importance of the evidence against the state interest in exclusion.

Appellant stresses that *Perry* was based upon a line of California caselaw which has since been modified. *See, People v. Hall,* 41 Cal.3d 826, 226 Cal.Rptr. 112, 718 P.2d 99 (Cal.1986):

> We reject [*People v.*] *Arline,* 13 Cal. App.3d 200, 91 Cal.Rptr. 520 [ (1970) ] to the extent that it creates a distinct and elevated standard for admitting this kind of exculpatory evidence. Rather than speaking in terms of a [*People v.*] *Mendez* [193 Cal. 39, 223 P. 65 (1924) ]–*Arline* "rule," courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible (note omitted) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion. (note omitted).

The extreme position overruled in Hall, however, was not adopted in *Luna.* We observed, in *Luna,* at 233, that "State evidentiary rules may not be applied mechanistically to defeat the ends of justice." The rule expressed in *Luna* does not infringe upon Debra's right to due process for the reason that the evidence, in her case, is so weak in probative value and presents such an opportunity to confuse the jury and to waste time (See SDCL 19–12–3 and F.R.E. 403) to a far greater degree than in *Luna.*

■ The evidence excluded by the trial court is as follows:

1. Debra's neighbor secured restraining orders against her ex-husband to avoid physical abuse;
2. A woman telephoned the neighbor's house at 1:50 a.m. on the night Abby died, asking for Russell (the ex-husband's name was Russell);
3. A guest at the neighbor's party on the night Abby died saw a man she did not know walking near the Jenner home at 11:30 p.m.; and,
4. A man was seen in the graveyard where Abby was buried eight days after she died, who dressed similarly to the man seen walking near the Jenner home.

We deem this evidence has no relevance, and the trial court was correct to exclude it

under SDCL 19–12–3, of which *Luna* is simply an illustration.[3] We find no error here.

## IV. *Sufficiency of Evidence.*

■ Appellant's last argument is that the evidence presented at trial was insufficient to support her conviction. The trial court denied her motion for judgment of acquittal at the close of the State's case, and renewed at the close of evidence. This argument has two components: 1) SDCL 22–16–7, requires an act "imminently dangerous to others," whereas the attack on Abby was a danger only to her; and, 2) no evidence connects Debra to the crime. We strongly disagree with both assertions.

As to the definition of second degree murder in SDCL 22–16–7, we note that SDCL 2–14–6 provides: "Words used in the singular number include the plural, and the plural, the singular, except where a contrary intention plainly appears." We perceive no contrary intention in SDCL 22–16–7, and adopt the position of the Supreme Court of Maryland in *Robinson v. State,* 307 Md. 738, 751, 517 A.2d 94, 101 (1986), which held "depraved heart murder" to "not require more than one life be placed in imminent danger by an assailant's life-threatening act":

> We reach this conclusion because of what we have already said about the blameworthiness of an act that, without intent to kill, nevertheless produces that result because of the action's reckless disregard for the likely fatal consequences of the act. We are not persuaded that such act is punishable as second degree murder only when several potential victims are involved.

*Robinson,* 307 Md. at 751, 517 A.2d at 101. This is in accord with *State v. Lowe,* 66 Minn. 296, 68 N.W. 1094 (1896) and *Hogan v. State,* 36 Wis. 226 (1864), *contra, Darry v. People,* 10 N.Y. 120, 4 N.Y.S. 137 (1854).

Appellant relies on *State v. Reddington,* 7 S.D. 368, 379, 64 N.W. 170, 174 (1895), for the proposition that "where one state adopts the statute of another state it takes it impressed with the meaning and construction which had been judicially given it at the time of its adoption[,]" with its observation that our territorial legislature "evidently" borrowed New York's murder statutes in enacting the Penal Code in 1865, in attempting to lock res into the long-superceded interpretation in *Darry.* The murder statute in *Darry* was in common use, as *Robinson* indicates, and interpretations of the point now in question varied. The legislative intent in 1865 is too murky to cleave in so facile a manner, especially as the *Reddington* court's use of "evidently" does not reflect certainty.

■ Finally, we consider Debra's last argument, that there is no evidence connecting her to Abby's killing. Her position is without merit, as she no more than derides unfavorable evidence, and inferences therefrom, as "speculation." *State v. Miller,* 429 N.W.2d 26, 38 (S.D.1988). In determining the sufficiency of evidence on appeal, the question presented is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. *Miller, id.* In making this determination, the Court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict. *Miller, id.* All elements of a crime, including intent, may be proven with circumstantial evidence. *State v. Cody,* 323 N.W.2d 863, 869 (S.D.1982).

The evidence against Debra includes her own statements, in which she provided information which tallies with the physical evidence, example being the model plane, which fits one wound "uniquely"; and when she remarked that her hair was down, and Abby pulled it, this tallies with the hair samples taken from Abby's body. This is highly damning against her. Debra said she might have "gone click" or "psyched out," terms completely undefined in the record, yet the devastation visited on Abby was characterized, by an expert, as a

---

**3.** In *Luna* the defendant had a far stronger argument, as the third party perpetrator's evidence included a violent drunk who was near the crime scene, covered in blood, shortly after a killing, and confessed.

"frenzy." The child's body was mutilated by the seventy stab wounds. Debra described Abby as being on her stomach and resisting, truly, as evidenced by the placement and nature of Abby's wounds.

Although the defense tried to maintain that the Jenners' outside doors were unlocked, Debra told officer DeVaney that the front door was locked, and other testimony established that the back door was not quick to open, i.e., locked. There was absolutely no evidence of forced entry into the Jenner home. Debra also was quoted as saying "I did it, I did it," and although she later denied using these words, the testimony stands. Clothing similar to that she once claimed to have worn to bed on the night in question, was found in a laundry hamper next to a washing machine, corresponding to her references to having cleaned up after Abby's death. She made statements to friends and co-workers—that she would accept going to an institution but did not want to go to prison—that there was a war inside her between God and Satan, and that Abby's death was the work of Satan—and then tried to telephonically tell the grand jury witnesses, Kay Brink and Joan Bieyer, in the days before their testimony, on how to testify. Debra told police that she could not smell blood in Abby's room, yet she washed her hands repeatedly that morning, complaining that she could not get rid of the smell. Her ring, voluntarily given to police as reportedly unscrubbed, was apparently washed often that day—it was on her finger. Appellant's bedroom was only twenty feet from the murder scene. The murder weapons—a Chicago Cutlery knife and a toy airplane—came from within the Jenner home. Appellant testified that she could hear her children walking to the bedroom door when they needed assistance at night, yet testified she slept through Abby's killing although physical evidence indicated that the little girl struggled in the course of a prolonged attack. Different weapons were used and seventy stab wounds are consistent with a conclusion of a prolonged attack. Appellant admitted that the little girl was "hyper" in previous days and soiled her pants several times the previous day; she informed a friend that the little girl was irrational the night of the killing. A mass of circumstantial and direct evidence convinced this jury, beyond a reasonable doubt, that appellant had murdered her own three and a half year old daughter. The evidence, and inference therefrom, was sufficient. A guilty verdict will not be set aside if the State's evidence, concerning all favorable inferences to be drawn therefrom, supports a rational theory of guilt. *State v. Dale*, 360 N.W.2d 687, 690–691 (S.D.1985). Jury instruction No. 22 correctly instructed the jury on both direct and circumstantial evidence.

### State's Notice of Review (16240)

As we affirm Debra's conviction, we do not address the State's argument that she was charged with two distinct statutory violations and could be convicted of both. The trial court instructed the jury that second degree murder and first degree manslaughter were alternative counts, and the jury, therefore, acquitted her of one count. This issue, of interest if retrial was ordered by this Court, is moot on affirmance.

Conviction and sentence affirmed.

WUEST, C.J., and MILLER, J., concur.

MORGAN and SABERS, JJ., dissent.

MORGAN, Justice (dissenting).

I join in Justice Sabers' dissent, but I write to express my frustration in reviewing this case.

First of all, I am appalled by the failure of the DCI agents to record the interrogation proceedings of April 7, 1987. It is inconceivable to me that they would gather a team of agents from across the state, with two sets of polygraph equipment, and not have any form of tape recorder available. Thus, we are left with the testimony of the agents and Debra for the details of an extended interrogation and that testimony was not given until some nine months later, on January 6, 1988. It is of further interest to me that the authorities did not

seek an indictment until over four and one-half months after the interview.

The trial court, in its findings of fact for the suppression hearing, set the scene for this interview. It described the examination/interrogation room as being 12 by 14 feet, furnished with a table, 3 or 4 chairs, and a filing cabinet, with no windows to the outside and a one-way glass window for observation into the room. The room was bugged for listening but not recording and had no clock, radio or taping equipment. This was the milieu in which Debra found herself for some six or seven hours of interrogation except for two occasions when she went to the bathroom, the location of which we are not apprised of in the record.

Justice Sabers has detailed the interrogation procedures used on Debra, and I shall not repeat them except for two points that I wish to make.

First, the trial court finds certain instances where Debra talked of "psyching out" and suggested hypnotism, truth serum or psychiatry. This is relied on heavily by the majority to demonstrate cooperation on Debra's part. I suggest, however, that the trial court and the majority ignore the fact, as found by the trial court, that both Devaney and Giegling had planted the seed in Debra's mind that "there is a rational Debbie and an irrational Debbie," and "a good Debbie and a bad Debbie." Again the trial court and the majority stress Debra's statement to her husband, Lynn, when he was brought into the room: "I did it, I did it. Did you help me?" When Lynn said that he did not help her, as the record shows, Debra then recanted. That recantation is entirely overlooked in the finding as is the fact that the agents had previously lied to Debra *that Lynn had told them that she had done it.*

One of the trial court's findings is enigmatic in that it first finds that neither of the Jenners were advised of their *Miranda* rights and, further, that neither requested counsel, or that the questioning stop and never refused to answer a question. It is incomprehensible that any court could conclude that Debra's cooperation could be evidenced by her failure to exercise her *Miranda* rights when she had not been advised of those rights.[1] Nor can I agree with Justice Henderson that his writing in *State v. Meek,* 444 N.W.2d 48 (S.D.1989), is totally distinguishable because Meek was a DUI case and this is a murder case. *The Fifth Amendment does not distinguish between the crimes involved.* One suspected of murder, even as heinous an offense as this is, is surely entitled to the same constitutional rights as a drunk-driving suspect. We cannot chip away constitutional protections for murder suspects and strenuously enforce them for drunk-driving suspects.

The majority stresses that Debra testified that nothing prevented her from leaving; however, I note in her testimony, when asked by her counsel: "Did you feel you had any right to leave if you wanted to?" She responded: "No."

Justice Potter Stewart, writing in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), warned that: "Determination of whether a statement is involuntary 'requires more than a mere color matching of cases.'" 437 U.S. at 401, 98 S.Ct. at 2418, 57 L.Ed.2d at 306 (citation omitted). That is what I think that the majority has done. The opinion cites numerous cases to support the various factors individually, *e.g.,* failure to give the *Miranda* warning, polygraph testing, emotional state, cooperation, and interrogation methods. However, I find no citation for the proposition that the voluntariness of a confession must be judged by the "totality of circumstances" test; that is, the whole of the events is distinct from the parts.

---

1. The majority citation to *Michigan v. Mosley,* 423 U.S. at 102, 96 S.Ct. at 326, 46 L.Ed.2d at 320, is likewise incomprehensible inasmuch as *Mosley* dealt with the issue of interrogation after a defendant had been properly warned and had exercised his right not to talk. In the context of this case, the references to "informed and intelligent assessment" is ludicrous because Debra was never given any warning. The quotation from Justice White's concurrence was with respect to a person's right to make an informed waiver of *Miranda* rights. Read *in that context,* I have no quarrel with the statement.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Though the majority makes passing reference to "totality of the circumstances" and the trial court obviously tried to apply the rule, neither seems to understand the rule's import. The reason a court examines the totality of factors is that individually the factors may not in themselves be enough to overbear a person's will. *But combined, they react with one another and produce a synergistic evil, one greater than its individual parts.* Here, Debra's lack of sleep, or her inexperience, or lies told to her by DCI agents, or the yelling and screaming at her, or the length of the interrogation, each in itself may have not been enough to overbear her will and render her statement involuntary. But combined, all these factors produced a greater evil than their parts and overbore her will and rendered her statements involuntary.

Finally, although I agree with Justice Sabers and would reverse under the clearly erroneous scope of review, I think that it is time to recognize the need for a change to what the federal courts denominate a "plenary review," because the ultimate issue of voluntariness is a mixed question of law and fact that should be reviewed as a question of law. Granted, as the majority toilsomely points out, our precedent for standard of review on the issue of voluntariness is the clearly erroneous standard as applicable to any factual issue. That is not to say that for good reason that standard cannot be changed. Justice Henderson has gone to great length to enumerate the cases wherein the various members of this court have written or voted in support of the present scope of review. I acknowledge those votes and writings attributed to me, but that does not mean that I cannot alter my position when the proper case comes along. I so indicated in my special concurrence in *Walz v. City of Hudson*, 327 N.W.2d 120 (1982), wherein this court overruled past precedent, particularly *Griffin v. Sebek*, 90 S.D. 692, 245 N.W.2d 481 (1976), and created a right of action for negligent sale of alcoholic beverages to an intoxicated person. Then Chief Justice Fosheim authored that opinion and was joined by Justices Dunn and Henderson. Justices Wollman and Morgan concurred specially. I then stated that "I am not loath to fly in the face of stare decisis and overrule a bad decision or one that is outdated." Justice Wollman's writing is especially pertinent in explaining his reversal of his stance in *Griffin* by quoting Justice Frankfurter's aphorism that "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters National Bank & Trust Co.*, 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259, 264 (1949) (Frankfurter, J. dissenting).

And, as we said earlier in *State v. Nuwi Nini*, 262 N.W.2d 758, 761 (1978):

If there is to be stability and an even-handed administration of justice, this court must follow its own precedent until convinced that its earlier decision was wrong, not in result, but in principle.

It is my position that the principle of considering voluntariness as a factual question is wrong. It should be considered as a mixed question of fact and law. The trial court does find such underlying factual issues as length and circumstances of interrogation, the size of the interrogation room, Debra's age and experience, and it is entitled to be upheld on those factual determinations unless they are clearly erroneous in the light of the entire record. However, once these determinations are made, the trial court is in no better position than we are to judge *the totality of the circumstances* to determine whether the confession was obtained in violation of the due process clause of the 14th Amendment. *Fenton II*, 474 U.S. at 117, 106 S.Ct. at 453, 88 L.Ed.2d at 415. These latter determinations are legal in nature and viewing the witness is unnecessary in arriving at the proper decision. We can give deference to the trial court's findings of fact where supported by the record under the clearly erroneous standard, but the question of how those facts combine to produce lack of voluntariness and deprivation of due process is a legal question that requires de novo review.

Further, there is a question of playing on an even-playing field. The majority cites numerous federal cases for various positions to uphold the voluntariness of Debra's statements, but those cases were decided using a plenary review. In the event of appeal or petition for habeas corpus, this decision would be reviewed by plenary standards. That is mandated, as stated in *Miller v. Fenton, (Fenton II)*[2] wherein the United States Supreme Court said:

> Without exception, the Court's confession cases hold that the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination.... As recently as 1978, the Court reaffirmed that it was 'not bound by' a state-court voluntariness finding and reiterated its historic 'duty to make an independent evaluation of the record." (Citations omitted.)

474 U.S. at 110, 106 S.Ct. at 450, 88 L.Ed.2d at 411. The federal courts use this standard in habeas corpus proceedings as well as direct appeals. *Id.* As Justice O'Connor stated in *Fenton II:*

> [T]he nature of the inquiry itself lends support to the conclusion that 'voluntariness' is a legal question meriting independent consideration in a federal habeas corpus proceeding. Although sometimes framed as an issue of 'psychological fact,' ... the dispositive question of the voluntariness of a confession has always had a uniquely legal dimension.... This hybrid quality of the voluntariness inquiry, subsuming, as it does, a 'complex of values,' ... itself militates against treating the question as one of simple historical fact.

474 U.S. at 115–16, 106 S.Ct. at 453, 88 L.Ed.2d at 411–15 (footnote omitted) (citations omitted). While it may be that the federal court decisions on standards of review are only persuasive and not binding precedent, and the federal courts will still make an independent examination, it seems logical to me that we should take advantage of playing on a level field.

**2.** *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (*Fenton II*), was an appeal from *Miller v. Fenton,* 741 F.2d 1456 (3rd Cir. 1984) (*Fenton I*), and directed the remand that

451 N.W.2d—17

resulted in *Miller v. Fenton,* 796 F.2d 598 (3rd Cir.1986) (*Fenton III*), quoted frequently in the majority opinion.

I would reverse the conviction and remand for a new trial.

SABERS, Justice (dissenting).

Debra Jenner is entitled to a new trial. The State failed to meet its burden of proof beyond a reasonable doubt that these statements were freely and voluntarily given. In addition, the State wholly failed to give required *Miranda* warnings in a custodial setting.

1. *Admission of statements made by Jenner to the police on April 7, 1987.*

Jenner claims that the trial court erred in admitting the statements she made to the police on April 7, 1987. She claims these statements were involuntary and violated her right to a fair trial under the Due Process Clause. She also claims the statements should have been suppressed because she was not advised of her *Miranda* rights. In response, the State argues that the trial court did not err in finding Jenner's statements voluntary and that no *Miranda* warnings were necessary as she was not in custody.

A. Voluntariness of Jenner's statements.

The use of involuntarily obtained confessions or statements deprive a defendant of due process of law. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). As stated in *Miller:*

> This Court has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.

*Id.,* 474 U.S. at 109, 106 S.Ct. at 449, 88 L.Ed.2d at 410. The Supreme Court has

stated that our criminal system is "an accusatorial and not an inquisitorial system," and the tactics used to elicit inculpatory statements must fall within the constitutional boundaries imposed by the Due Process Clause of the Fourteenth Amendment. *Rogers v. Richmond*, 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760, 766 (1961). The Court has continued to require that confessions be voluntary to satisfy the requirements of due process, *Miller, supra,* even after *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which extended the privilege against self-incrimination to custodial interrogations.

The voluntariness of a defendant's statements is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Hallman*, 391 N.W.2d 191 (S.D. 1986); *State v. Hartley*, 326 N.W.2d 226 (S.D.1982). The Supreme Court has set out the following inquiry to determine voluntariness:

'Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'

In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. In all these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted.

*Schneckloth, supra,* 412 U.S. at 225–26, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. (citations and footnote omitted).

The State has the burden to prove *beyond a reasonable doubt* that a statement was freely and voluntarily made by a defendant. *State v. Gregg*, 405 N.W.2d 49 (S.D.1987); *State v. Volk*, 331 N.W.2d 67 (S.D.1983); *State v. Hintz*, 318 N.W.2d 915 (S.D.1982). In reviewing the trial court's finding on voluntariness, we must consider the evidence in the light most favorable to the decision and may reverse the decision only if we find it to be clearly erroneous. *Hallman, supra; State v. Janis,* 356 N.W.2d 916 (S.D.1984).

The totality of the circumstances requires an examination of both 1) the characteristics of the accused and 2) the details of the interrogation. *Schneckloth, supra.* In considering the characteristics of the accused, the trial court noted that Jenner had not slept much prior to the examination and that she had not eaten that day. The court also noted that she was intelligent and educated. These are the only facts the court considered as to the characteristics of the accused. The court concluded: "I do not feel that the lack of sleep or food affected the Defendant to such an extent that it would make her statements involuntary." Jenner argues that the trial court failed to consider the emotional and physical drain from the recent loss of her daughter. She argues that the court failed to mention her lack of previous experience with law enforcement and her deep respect for authority ingrained from her religious beliefs. Jenner also claims that the court considered her characteristics in isolation, rather than in connection with the effect the eight-hour interrogation had upon these characteristics, as required by the totality of the circumstances test.

We are hampered in our review of the interrogation itself, as was the trial court, because the agents failed to record the interrogation. However, it is undisputed that the DCI agents became accusatory immediately after the polygraph examination. Following the polygraph, three different agents took turns questioning Jen-

ner from 3:30 p.m. until approximately 10:00 p.m. During this time Jenner was never informed of her constitutional rights. The agents used various interrogation techniques which they admitted were aimed at compelling Jenner to confess. The agents repeatedly told Jenner that they did not believe her and that she should tell them the truth about her daughter's death. The interrogation techniques included yelling and the use of false, hypothetical questions, such as her husband having told the agents that she committed the murder. The record reveals that the interrogators also played upon her strong religious convictions and her sex life with her husband. The interrogation continued through an evening family memorial service on the eve of Abby's funeral. During these six hours of intense interrogation, the agents permitted Jenner to make two trips to the rest room and brought her one Diet Coke. There were no other breaks until Agent Giegling decided to terminate the interrogation because he concluded that Jenner was suffering a nervous breakdown. The agents testified that Jenner's emotional state during the interrogation varied from calm to hysterical. There were times that she would cry and sob, while other times she would stare in complete silence.

While the use of certain interrogation techniques does not of itself invalidate a confession under the Due Process Clause, such techniques are important to the inquiry, and must be considered together with the characteristics of the accused. *Miller, supra; Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). The Court has noted that such techniques may cross the line between "permissible police conduct" and "methods offensive to due process." *Haynes, supra.* In this case, the psychological impact of these techniques upon Jenner was immense.

The State argues that Jenner made several comments during the interrogation which indicated the voluntariness of her statements. At one point she asked Agent DeVaney if he could hypnotize her to help her remember. At another point she asked Agent Giegling if he could "jar her memo-

ry." While these statements are relevant in considering the totality of the circumstances, they are not controlling and must be viewed in the context of the interrogation. If anything, these statements indicate Jenner's emotional breakdown, rather than any desire to make voluntary statements.

The trial court placed great emphasis on Jenner's comments and the fact that she seemed to cooperate completely with the agents and never expressed a desire to terminate the interview. The court stated:

The one common thread throughout this whole proceeding which was glaringly evident to this Court was the total voluntary cooperation by the Defendant. She voluntarily came to the police station, accompanied by her family and friends; she voluntarily took the polygraph test and continually answered questions knowing she did not have to do so; she voluntarily provided physical evidence; she voluntarily signed consent forms; and she knew her husband had signed search consent forms. In short, the Defendant did not have to come down to the station, did not have to take any tests, did not have to answer any questions, and could leave at any time she wanted, and was well aware of her rights in this regard. The Defendant simply and unequivocally voluntarily cooperated with law enforcement.

Clearly, Jenner did not "know" that she could stop answering questions and was not "well aware of her rights" because the agents completely failed to inform her of these rights. Further, she did not know she was free to leave, if, in fact, she was. Though Jenner appeared generally cooperative with the agents, the State had the burden to prove beyond a reasonable doubt that this cooperation was of her own volition and not because her will was overborne during the interrogation. The State cannot meet this burden under the totality of the circumstances. Furthermore, mere *cooperation* in the early stages of a lengthy investigation does not make a statement voluntary. The majority ignores the fact that an intense, psychologically

coercive interrogation intervened between the initial cooperation and the statements in question. The nature of that interrogation precludes the possibility of the statements actually being free and voluntary.

The State argues that deference must be given to the trial court's decision, as the trial court is better able to determine the credibility of the witnesses. *State v. Stumes*, 90 S.D. 382, 241 N.W.2d 587 (1976). However, in this case most of the evidence of the interrogation is not disputed. It is undisputed that Jenner was never informed of her rights and that she was subjected to more than six hours of intense interrogation during which she was repeatedly accused of not telling the truth. It is undisputed that she was under a great deal of stress and trauma and that she had little sleep prior to the interrogation. It is clear that the agents used psychologically coercive interrogation techniques which caused Jenner to break down emotionally. Further, in finding that Jenner's statements were voluntary the court emphasized certain evidence without assessing the totality of circumstances. In addition, the failure of the agents to record the interrogation with the listening and recording devices available to them makes it difficult for the State to sustain its burden. The testimony at the suppression hearing, which is the only evidence available to review, does not support the trial court's finding that Jenner's statements were voluntary beyond a reasonable doubt. Substantial doubt not only exists, it prevails. We should hold the trial court was *clearly erroneous* in determining that Jenner's statements were voluntary and their use at trial violated her constitutional right to due process.

B. Failure to give *Miranda* rights.

The record also supports Jenner's claim that the agents' failure to advise her of her constitutional rights required suppression of the statements. The State concedes that the agents failed to read Jenner her *Miranda* rights, and I reject the State's claim that no *Miranda* warnings were necessary because Jenner was not in custody during the questioning.

In *Miranda* the Supreme Court held that a suspect must be advised of the right to remain silent and the right to an attorney prior to any custodial interrogation. *See also Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The *Miranda* Court stated that failure to give *Miranda* warnings under such circumstances creates a presumption of improper compulsion.

> [O]ur accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. (citations omitted).

*Id.*, 384 U.S. at 460, 86 S.Ct. at 1620, 16 L.Ed.2d at 715. The question of custody depends upon whether "the person being questioned is in custody or deprived of his or her freedom to leave." *State v. Bruske*, 288 N.W.2d 319, 322 (S.D.1980). Though Jenner was not formally "in custody" on April 7, she was deprived of her freedom of action in a significant way.

In *State v. McQuillen*, 345 N.W.2d 867, 870 (S.D.1984), we stated:

> This court has set forth a number of factors to be examined in determining whether an interrogation is custodial or noncustodial: probable cause to arrest, subjective intent of the defendant, focus of the investigation, nature of the interrogator, nature of the suspect, time and place of the interrogation, nature of the interrogation, and purpose of the investigation.

Although the police may not have had probable cause to arrest Jenner at the start of the interrogation, the other factors listed in *McQuillen* all tend to show that she was in custody.

The State argues that Jenner complied with all the officers' questions and never tried to stop the interview. However, Jenner testified that she believed she was not free to leave. She also voiced an objection to the interrogation by asking Agent Giegling "Why are you putting me through this[.]" The agent apologized and then continued with his interrogation. It is ap-

parent that the investigation focused on Jenner as the prime suspect. In addition, this was not a short interrogation as that in *McQuillen*[1] and it was often hostile and accusatory toward Jenner. In *McQuillen* the court noted that the conversation between the police officer and the suspect was calm and neither accusatory nor hostile. Further, this was Jenner's first experience with law enforcement. Finally, the sole purpose of the interrogation was to obtain a confession from Jenner, not to gather further general information for the investigation of Abby's murder. Under these circumstances, Jenner was in custody and *Miranda* warnings should have been given to her prior to the interrogation.

The majority overemphasizes its claim that Jenner was not actually physically restrained. Physical restraint is only one of many factors to be considered and is not dispositive in this case. When all the *McQuillen* factors are considered, it is evident that Jenner was subjected to a custodial interrogation even though she may have been allowed to get up and walk out.[2]

As the author of the majority opinion, Justice Henderson wholly ignores what he said recently in *State v. Meek*, 444 N.W.2d 48, 51–52 (S.D.1989):

> Further, Meek was cajoled into taking the tests, an indication that his efforts were involuntary; note the majority opinion wherein police officer is quoted saying that it would be to Meek's "advantage to try to do some tests ...", in other words, to incriminate himself. *See, Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The purpose of the officer's actions, here, were to elicit incriminating responses, i.e., to gather incriminating evidence. Meek was, consequently, under the functional equivalent of interrogation, as defined in *Rhode Island v. Innis*, 446 U.S.

291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

The circumstances of this case warranted suppression. The majority's reversal of the trial court is but one more in a series of cases which have chipped away constitutional protections for South Dakotans.

> Erosions of liberty do not come in giant leaps, they come in miniscule encroachments often hidden to the trained and educated mind. Like a thief in the night, language can steal a liberty deeply ingrained in the fabric of the American way of life. I am afraid of each little encroachment on the liberty of my fellow Americans on the highway.

*State v. Anderson*, 331 N.W.2d 568, 573 (S.D.1983) (Henderson, J., concurring in result). Here, the long-standing right against self-incrimination is being gradually eroded.

The obvious inconsistency in Justice Henderson's writings reminds me of the saying: "Those who cannot remember the past are condemned to repeat it."[3]

We recently held that *Miranda* is a bright line rule which must be adhered to when a person is in custody. *Satter v. Solem*, 434 N.W.2d 725 (S.D.1989), *cert. denied, Rist v. Satter*, —— U.S. ——, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989). *Satter* states: "After all, it requires no great effort to take out the *Miranda* card, read the subject his rights, and ask the simple questions: Do you understand your rights and do you waive them?" *Id.* at 727. The failure to administer *Miranda* warnings creates a presumption of compulsion and any unwarned statements must be suppressed. *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Satter, supra.* The statements made by Jenner following the lie detector test should

---

1. In *McQuillen*, the defendant was interviewed twice in a locked interrogation room. The first interview lasted twenty to thirty minutes. There is no indication as to the length of the second interview, but it also appears to have been short.

2. In fact, the Colorado Supreme Court found a custodial interrogation in somewhat similar circumstances even though the defendant was not forced to submit to questioning. In *People v.*

*Longoria*, 717 P.2d 497 (Colo.1986), the court determined the questioning of the defendant constituted a custodial interrogation where the police officers asked the defendant to accompany them to the police station to talk about a sexual assault. The officers specifically informed the defendant he was not under arrest.

3. G. Santayana, *The Life of Reason* 82 (1954).

732

have been suppressed, as they are in violation of *Miranda.*

Can a reasonable person really conclude: that the State met its burden of proof that these statements were voluntary *beyond a reasonable doubt?*

When recording equipment was available but *no* recordings were made or even attempted.

When trickery was used in the interrogation.

When experienced, intelligent officers failed to give required *Miranda* warnings.

When the officers quit only when they feared an immediate nervous breakdown.

To me, it is not even a close question that the statements were *in* voluntary. This is so without regard to the standard of review used: clearly erroneous or mixed question of fact and law necessitating full review. However, I join Justice Morgan's dissent in all respects.

Because we should reverse and remand for a new trial on Issue 1, it is not necessary to discuss the other issues raised by Jenner. We should also reject the State's notice of review questions without discussion.